IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

GEORGE L. WADE, JR., THE ESTATE
OF GEORGE L. WADE, SR., DECEASED,
AND HIS HEIRS AT LAW                          PLAINTIFFS

v.                              CAUSE NO.2:16cv47KS-MTP

THE CITY OF HATTIESBURG, MS,
OFFICERS DEMETRIUS BRELAND and
NAROTTAM HOLDEN, INDIVIDUALLY
AND IN THEIR CAPACITIES AS
POLICEMEN WITH THE HATTIESBURG
POLICE DEPARTMENT, AND JOHN
DOES 1-10                                     DEFENDANTS


****************************************

**DEPOSITION OF GEORGE L. WADE, JR.**

****************************************

Taken at
Hicks Law Firm, PLLC
211 South 29th Avenue, Suite 201
Hattiesburg, Mississippi 39401
on Monday, July 24th, 2017
beginning at approximately 10:00 a.m.



********************************

*ANGELI ENGLISH*
*Shorthand Reporter #1897*
*Notary Public*


*ASPIRE REPORTING, LLC*
*Post Office Box 2605*
*Ridgeland, Mississippi 39157*
*601.797.9240*
*1.800.73.STENO*


EXHIBIT
C

# A P P E A R A N C E S

For the Plaintiffs:

**OTTOWA E. CARTER, JR., ESQUIRE**
Ottawa E. Carter, Jr., PA
604 Highway 80 W, Suite N
Clinton, MS 39056-4108
601.953.4712
oec@ottowacarterlaw.com

For the Defendants:

**R. LANE DOSSETT, ESQUIRE**
Hicks Law Firm, PLLC
211 South 29th Avenue, Suite 201
Hattiesburg, Mississippi 39404
601.544.6770
lane@hicksattorneys.com

Also Present:

Susa Wade

# TABLE OF CONTENTS

**PAGE**

Title Page.................................... 1

Appearance Page.............................. 2

Table of Contents............................ 3

Stipulation Page............................. 4

EXAMINATION OF GEORGE L. WADE, JR.

    By Mr. Dossett.........................5
    By Mr. Carter......................... 128

Certificate Page............................ 130

Errata Sheet............................... 131

## E X H I B I T S

Exhibit 1, Emma Curry's Statement of 4/16/13. 74

Exhibit 2, Danielle Lewis' Statement of
4/17/13.................................... 116

<pre>
 1                    STIPULATION

 2

 3          It is hereby stipulated and

 4    agreed by and between the parties hereto, through

 5    their respective attorneys of record, that this

 6    deposition may be taken at the time and place

 7    hereinbefore set forth, by ANGELI ENGLISH, Court

 8    Reporter and Notary Public, pursuant to the

 9    Rules;

10          That the formality of **READING AND**

11    **SIGNING** is specifically **NOT WAIVED;**

12          That all objections, except as to the

13    form of the questions and the responsiveness of

14    the answers, are reserved until such time as the

15    deposition, or any part thereof, may be used or

16    sought to be used in evidence.

17

18                      * * *

19

20

21

22

23

24

25
</pre>

**GEORGE WADE, JR.**

having been first duly sworn,

was examined and testified as follows:

**EXAMINATION**

BY MR. DOSSETT:

Q.   Mr. Wade, we met shortly before the deposition.  My name is Lane Dossett, and I represent the City of Hattiesburg and some officers that have been named in a lawsuit that you have filed, and also this lawsuit is proceeding on behalf of your father.

I understand before we began this morning that you go by, Wade, so I'll be calling you Wade this morning.

MR. DOSSETT:  Off the record just a second.

BY MR. DOSSETT:

Q.   You've got a fine attorney here, Mr. Carter, and I know he prepared you for your deposition.  But I just want to go over just a couple of ground rules, if we can, and that would be two things.  The first is that you let me finish my question and then that you answer. That way the court reporter can take down your answers and we won't be talking over each other.

1    A.   Yes, sir.

2    Q.   And the other thing is that you give a

3  verbal answer, that is, yes, or, no, or explain

4  your answer using words instead of a head nod --

5    A.   Yes, sir.

6    Q.   -- or a, uh-huh, or, huh-uh.  She can't

7  take those down.  Okay?

8    A.   Yes, sir.

9    Q.   I'll like to begin by asking you some

10  background information.  Some of this information

11  may be personal to you but it just helps me to

12  get to know you.  And none of these questions are

13  meant to be intrusive to you but there's a reason

14  for them, and they are not unique to you.  They

15  are questions I ask everyone.

16    A.   Yes, sir.

17    Q.   I'll begin by getting your full name,

18  please.

19    A.   George Lee Wade, Jr.

20    Q.   And your father was George Lee Wade,

21  Sr.?

22    A.   Yes, sir.

23    Q.   How do you spell Lee?

24    A.   L-e-e.

25    Q.   Okay.  And what is your current

1   address?

2       A.    1500 Cherry Street, Hattiesburg,

3   Mississippi 39401.

4       Q.    And this is the address where the

5   events that brought us here today occurred?

6       A.    Yes, sir.

7       Q.    How long have you lived at that

8   address?

9       A.    Fifteen years.

10          THE WITNESS:  16 or 15, Babe?

11          MR. CARTER:  You can't ask her.

12          THE WITNESS:  Oh.

13      A.    Fifteen years.

14  BY MR. DOSSETT:

15      Q.    Who owns that house?

16      A.    Me and my wife, Susa Wade.

17      Q.    And just for the record, it's not,

18  Susan, with an "n".  There's some nomenclature

19  that has to be fixed on that, but it's, Susa,

20  without the "n"?

21      A.    Yes, sir.

22      Q.    Where did you live before you lived on

23  Cherry Street?

24      A.    I lived at -- it was Brightville

25  Apartments, 1 -- L34.

1     Q.    Is that in the City of Hattiesburg?

2     A.    Yes, sir.

3     Q.    All right.  Cherry Street, if you could

4  kind of tell me what that's by.

5     A.    Right across the street from William

6  Carey University.

7     Q.    Okay.  The main entrance to William

8  Carey where you would go through the gate?

9     A.    There's a gate in front of my house,

10  yeah.  You can go through the gate on the side of

11  William Carey.

12     Q.    Is that where the little guard booth

13  is?

14     A.    No, sir.  It's on the other side.

15     Q.    By the new school of medicine?

16     A.    It's by the art building they just

17  build.

18     Q.    Okay.  And what is your phone number?

19     A.    306-8954.

20     Q.    And that's 601?

21     A.    Yes, sir.

22     Q.    And what is your date of birth?

23     A.    1st, 19, '66.

24     Q.    All right.  And how old would that put

25  you?

1    A.    Fifty-one.

2    Q.    And your Social Security number?

3    A.    XXX-XX-7700.

4    Q.    Okay.  And I understand you're married

5    to Ms. Susa Wade who is here today?

6    A.    Yes, sir.

7    Q.    I hate to put you on the spot, but when

8    were you married?

9    A.    2002.

10    Q.    Safe answer.  Were you married before

11    that?

12    A.    Yes, sir.

13    Q.    All right.  And what is your prior

14    wife's name?

15    A.    Debra Applewhite.

16    Q.    What's the middle name?

17    A.    It's Debra Applewhite.

18    Q.    Applewhite, one word?

19    A.    Yes, sir.

20    Q.    All right.  Does she live here in

21    Hattiesburg?

22    A.    No, sir.  And I don't know where she

23    live.

24    Q.    All right.  And what year were you

25    divorced?

1      A.    That's putting me on the spot.  I don't

2  recall that date.

3      Q.    All right.  Now, I'll like to talk to

4  you about your children.  I understand there were

5  a lot of your children present at that time.  So

6  let's go through your children, if we can, their

7  full names, oldest to youngest.  If you would,

8  give me their names, ages and where they live.

9      A.    Taneshia Roberts.

10     MR. DOSSETT:  And if you need him to

11     spell these, just let me know.

12     COURT REPORTER:  Okay.

13     A.    She's 26.

14 BY MR. DOSSETT:

15     Q.    Okay.  And where does she live?

16     A.    She live in Oak Grove.  That's all I

17 know, she live in Oak Grove.

18     Q.    Was she with you on April 16, 2013, at

19 your house when this happened?

20     A.    She came up during, while it was going

21 on.

22     Q.    Okay.  How do you spell her first name?

23     A.    I really don't know.

24     Q.    T-a-n-e-s-h-i-a, does that sound

25 correct?

1    A.    Yes, sir.

2    Q.    Okay.  And do you know her phone

3    number?

4    A.    I don't have it on me.

5    Q.    Okay.  Just keep your phone out.  We'll

6    probably go through a lot of them; maybe some

7    other ones you do have.

8          All right.  Where does she work at?

9    A.    At the nursing home in Petal.

10   Q.    Do you know what she does there?

11   A.    No, sir.

12   Q.    Did you see her?

13   A.    Yes, sir.

14   Q.    All right.  We'll get into that later.

15   Your son or daughter after that, next to

16   youngest, who would that be?

17   A.    Rayneshia.

18   Q.    And what is her last name?

19   A.    Roberts.

20   Q.    And do you know how to spell that?

21   A.    R-a-y-s-h-i --

22   Q.    R-a-y-s-h?

23   A.    -s-h- -- -s-i- -- I don't know.

24   Q.    How do you say it?

25   A.    Rayneshia.

1     Q.   Okay.  R-a-y-n-e-s-h-i-a, that sounds
2  right?
3     A.   Yes, sir.
4     Q.   And that's Roberts?
5     A.   Yes, sir.
6     Q.   And how old is she?
7     A.   Twenty-four.
8     Q.   And was she present on that day?
9     A.   Yes, sir.
10    Q.   Okay.  I can't remember if I asked you
11  this:  What was your prior wife's name?
12    A.   Debra Applewhite.
13    Q.   Applewhite.  Okay.
14         Taneshia and Rayneshia, what is their
15  mother's name?
16    A.   Susa.
17    Q.   Susa who?
18    A.   Wade.
19    Q.   Wade.  Okay.  Where did the last name
20  Roberts come from?
21    A.   Her maiden name.
22    Q.   Okay.  Was Rayneshia present throughout
23  everything?
24    A.   Yes, sir.
25    Q.   Taneshia arrived at some point --

1    A.    Yes, sir.

2    Q.    -- after the police arrived?

3    A.    Yes, sir.

4    Q.    Okay.  Where does Rayneshia live?

5    A.    She live -- I don't know the name of

6    those apartments.

7    Q.    What are they by?

8    A.    They are close by USM.

9    Q.    You know the street it's on?

10    A.    No, sir.

11    Q.    What is her phone number?

12    A.    601-606-0677.

13    Q.    And does Rayneshia work?

14    A.    She work at Wesley Hospital.

15    Q.    What does she do at Wesley?

16    A.    Housekeeping, I believe.

17    Q.    Okay.  All right.  After Rayneshia?

18    A.    Gennifer Roberts.  With a "G".  You

19    spell it with a "G."

20    Q.    How do you spell her name?

21    A.    G-e-n-n-i-f-e-r.

22    Q.    How old is she?

23    A.    Twenty-two.

24    Q.    And what is her phone number?

25    A.    It's 601-434-3819.

1    Q.    And was she present on the day that
2  this happened?
3    A.    When it first started she was, but she
4  left.
5    Q.    Do you know at what point she left?
6    A.    No, sir.  I can't remember.
7    Q.    Where does she work?
8    A.    At Bedford Care.
9    Q.    Bedford Care?
10   A.    Yes, sir.
11   Q.    Do you know what she does at Bedford
12 Care?
13   A.    No, sir.
14   Q.    Okay.  Who is after Gennifer?
15   A.    George Roberts.
16   Q.    And how old is George?
17   A.    Twenty-two.
18   Q.    Is him and Gennifer, are they twins?
19   A.    Yes, sir.
20   Q.    Okay.  And what is George's number?
21   A.    He don't have a phone.
22   Q.    Okay.  Where does George live?
23   A.    He stay in Pinehaven Apartments.
24   Q.    Was he present?
25   A.    Yeah.  He left, too.

1    Q.    Did he come back or did he -- when you
2    say he left, was he gone at the beginning or at
3    the end?
4    A.    He left before -- I think he left
5    before the police came.  Before the police
6    arrive, him and Gennifer left.
7    Q.    And where does George work?
8    A.    He don't work.
9    Q.    All right.  After George, who do we
10   have?
11   A.    Tavares.
12   Q.    Can you spell that for me?
13   A.    T-a-v-a-r-e-s, Wade.
14   Q.    Okay.  And how old is Tavares?
15   A.    Eleven.
16   Q.    And was he present?
17   A.    Yes, sir.
18   Q.    And does he live with you?
19   A.    Yes, sir.
20   Q.    All right.  Who is after Tavares?
21   A.    That's it.
22   Q.    You have five children?
23   A.    Yes, sir.
24   Q.    What about your wife, does she have any
25   other children that we have not mentioned?

1    A.    Them her children.

2    Q.    Right.  Does she have any additional

3    children?

4    A.    No, sir.

5    Q.    Okay.  At that time back in 2013, did

6    anyone else live with you?  Who lived in your

7    house?  Let me ask it that way.

8    A.    I think, if I'm not mistaken, George

9    and Gennifer was staying with me and Tavares.

10    Q.    So George and Gennifer and Tavares and

11    your wife, and those are the only ones that lived

12    in your house?

13    A.    Yes, sir.

14    Q.    Okay.  What about your father, he

15    didn't live with you?

16    A.    He was just there that day.

17    Q.    Okay.  Where did he live at the time of

18    this, 2013?

19    A.    Eagle Wings Apartments.

20    Q.    Where is that at?

21    A.    In Palmers Crossing on Perry.

22    Q.    Generally speaking, where is that?

23    Give me a directional reference.

24    A.    It's off old Airport Road.

25    Q.    Okay.  Near the Airport area?

1      A.    Yes, sir.

2      Q.    Did anyone live with him or was he

3  married?

4      A.    Well, my momma had died.  He had a

5  young lady, Emma, staying with him.

6      Q.    Emma Colquitt, something like that?

7      A.    Yes, sir.

8      Q.    Okay.  Was she present that day?

9      A.    Yes, sir.

10      Q.    So she was at your house with your dad?

11      A.    Yes, sir.

12      Q.    How long has it been since you talked

13  to Emma?

14      A.    I haven't talk to her since my father

15  passed because I think she moved.  I don't know

16  where she moved to.

17      Q.    You don't know if she's in the area?

18      A.    No, sir.

19      Q.    Do you know where she is from?

20      A.    She's from Peterman, Alabama.

21      Q.    Do you know if she went to Alabama or

22  have you heard anything?

23      A.    I haven't heard anything about her.

24      Q.    What was your mother's name?

25      A.    Lou Alice Wade.

1    Q.    Lou Ellis?

2    A.    Lou -- L-o-u, A-l-i-c-e, Wade.

3    Q.    And what year did she pass?

4    A.    I can't recall the year right now.

5    Q.    Can you give me approximately?  I mean,

6    I just want to know if she died within the last

7    couple years or if it's been longer.

8    A.    It's been longer than that.  I think --

9    I think in 2006.

10    Q.    Okay.  Now, brothers, what about

11    brothers and sisters, do you have brothers and

12    sisters?

13    A.    Yes, sir.

14    Q.    How many do you have?

15    A.    I have four brothers and three sisters.

16    Q.    And the reason I'm asking, for

17    potential jurors who might be on a trial.  What

18    are your brothers' names?

19    A.    John Wade.

20    Q.    John Wade?

21    A.    Yes, sir.

22    Q.    Where does he live?  And I'm just

23    asking the city right now does he live.

24    A.    He stay in Forrest County, Oak Grove.

25    Q.    Where does he work?

1    A.    He don't work.

2    Q.    Okay.   How old is he?

3    A.    Forty-six.

4    Q.    All right.   What other brothers do you

5    have?

6    A.    Daniel Wade.

7    Q.    Where does he live?

8    A.    Charleston, South Carolina.

9    Q.    What other brothers do you have?

10   A.    Cedric Burkette.

11   Q.    Can you spell Burkette?

12   A.    No, sir.

13   Q.    Okay.   Where does he live?

14   A.    Chicago.

15   Q.    Okay.   What other brothers do you have?

16   A.    Marcus Magee.

17   Q.    Where does he live?

18   A.    He stay in Knoxville, Tennessee.

19   Q.    Okay.   And your sisters?

20   A.    Cheryl Wade.

21   Q.    Where does she live?

22   A.    Oak Grove.

23   Q.    And how old is she?

24   A.    Forty-eight.

25   Q.    And does she work?

1     A.   No, sir.

2     Q.   All right.  Your other sister?

3     A.   Heather Jackson.

4     Q.   Where does she live?

5     A.   Jacksonville, Florida.

6     Q.   And your other sister?

7     A.   That's all the sisters.

8     Q.   I thought you said you had three

9 sisters?

10    A.   It's two of them.

11    Q.   You just have two sisters?

12    A.   Yes, sir.

13    Q.   Okay.

14    A.   I have another brother, Raymond.

15    Q.   Can you spell that?

16    A.   R-o- -- R-o-m- --

17    Q.   Raymond?

18    A.   Yes, sir.

19    Q.   Okay.

20    A.   And Raymond carry the same name as

21 Emma.

22    Q.   I'm sorry.  What's the last name?

23    A.   Well, Emma's last name.

24    Q.   Oh, C-o-l-q-u-i-t-t?

25    A.   Yes, sir.

1    Q.    Is Emma, Raymond's mother?

2    A.    Yes, sir.

3    Q.    Okay.  And where does Raymond live?

4    A.    He stay in Oak Grove, too.

5    Q.    How old is Raymond?

6    A.    Between -- I think he's 23.

7    Q.    Let's talk now about your background.

8  Did you grow up here in Hattiesburg?

9    A.    In the country.

10    Q.    Where at?

11    A.    Waynetown.

12    Q.    Where is that?

13    A.    Outside of Petal.

14    Q.    Okay.  I'm familiar with Petal.  What

15  area?

16    A.    Well, there's Petal, Sunrise and then

17  Waynetown and New Augusta.  It's between Sunrise

18  and New Augusta.

19    Q.    Is it off of Highway 42 or Highway 26?

20    A.    No.  It's Old Rifle Range Road.

21    Q.    Okay.  My in-laws live out there.

22    A.    Oh, yeah.  Old Rifle Range and take

23  McGilvary Road.

24    Q.    Yeah.  How old were you when you lived

25  in that area?

1   A.   From birth to 22.

2   Q.   What school did you go to?

3   A.   New Augusta.

4   Q.   Did you graduate high school?

5   A.   Yes, sir.

6   Q.   Okay.  Did you go anywhere after high

7   school?

8   A.   No, sir.

9   Q.   After high school, roughly speaking,

10  what kind of work or what did you do after that?

11  A.   I worked at Marshall Durbin for nine

12  years and then I -- after that, I went to the

13  penitentiary.  And after that -- and worked at

14  United Roofing in Laurel.  And then, after that,

15  I went Loresco, and I've been there ever since

16  1999.

17  Q.   All right.  What is Loresco?

18  A.   It is a cathodic engineer company that

19  inserts earth control backfill to use on gas

20  lines and oil rigs.

21  Q.   Okay.  L-o-r-e-s-c-o?

22  A.   Yes, sir.

23  Q.   Okay.  You used a lot of words there I

24  didn't understand.  Tell me, generally speaking,

25  what it is that you do.

1    A.    I'm a supervisor.

2    Q.    All right.  Do you work in the oil

3    field?

4    A.    No, sir.  I work in the office.  We

5    just make the products that we ship to the guys

6    that use it in the oil field.

7    Q.    Okay.  And what products is it you

8    make?

9    A.    Air control vac seals.

10   Q.    What does that do?

11   A.    It's for the pipes that they use under

12   the ground to put or go around the pipes to keep

13   the pipes from rusting and corroding, the gas

14   line and the pine line.  It is really a rust

15   eater.

16   Q.    Okay.  What kind of supervisor are you,

17   what do you do as a supervisor?

18   A.    Warehouse supervisor.

19   Q.    And you've been there since 1999?

20   A.    Yes, sir.

21   Q.    Do you have any type of certificates or

22   licenses?

23   A.    Like what?

24   Q.    Any kind of certification?

25   A.    Oh, no, sir.  No, sir.

Q.   Do you have a CDL driver's license?

A.   No, sir.

Q.   How long had you been in the penitentiary?

A.   Nine years.

Q.   And what did you go to the penitentiary for?

A.   Controlled substance and possession of firearm.

Q.   Where did that charge occur?

A.   In Forrest County.

Q.   Who was the arresting agency?

A.   Hattiesburg PD.

Q.   Do you remember what year you were arrested?

A.   I don't remember what year.

Q.   That charge, did it occur at your residence or were you in a car or how did it occur?

A.   At the club on Mobile Street.

Q.   All right.  Walk me through what happened with that arrest.

A.   Well, I was selling drugs and I had a friend with me.

Q.   What drugs were you selling?

1   A.   Cocaine.

2   Q.   And were you selling them in the club

3   or outside the club?

4   A.   Outside the club.

5   Q.   In a car or just standing in the

6   parking lot?

7   A.   In the parking lot.

8   Q.   All right.  At that time were you

9   living in Hattiesburg?

10   A.   Yes, sir.

11   Q.   Okay.  And who was the friend you had

12   with you?

13   A.   His name was Feezell (phonetic) Myers

14   (phonetic).

15   Q.   Was Feezell arrested, as well?

16   A.   No, sir.

17   Q.   Okay.  You were selling drugs in the

18   parking lot.  What happened?

19   A.   Well, I was inside shooting pool and

20   Feezell came to get me to take me downstairs.  He

21   said they wanted something outside.  When I got

22   outside, it was Hattiesburg PD.

23   Q.   Under cover?

24   A.   Yes, sir.

25   Q.   Do you know who the officer was?

1     A.    No, sir.  I don't remember.

2     Q.    What happened after you got outside?

3     A.    After I got outside, I talked to the
4  guy.  Then I see some more guys down the street
5  and I know it was the police, so we got in a
6  tussle.  And they arrested me and took me to the
7  county jail.

8     Q.    Okay.  You got into a tussle with the
9  undercover officer?

10    A.    Yes, sir.

11    Q.    All right.  What was the reason for the
12 tussle?

13    A.    Because I knew it was the police and I
14 was trying to run and he slammed me down.

15    Q.    All right.  What happened during the
16 tussle?

17    A.    When they throw me to the ground, they
18 just put the handcuffs and put me in the car and
19 took me downtown and they booked me in.

20    Q.    And what year was that?

21    A.    I don't remember what year it was.

22    Q.    When they threw you to the ground, were
23 you injured?

24    A.    No, sir.

25    Q.    All right.  Did you have any medical

1    care?

2         A.   No, sir.

3         Q.   All right.  What were you charged with?

4         A.   I was charged with possession of a

5    controlled substance.

6         Q.   All right.  Were you charged with

7    resisting arrest?

8         A.   No, sir.

9         Q.   Were you charged with assault on an

10   officer?

11        A.   No, sir.

12        Q.   Anything other than a controlled

13   substance?

14        A.   No, sir.

15        Q.   Possession of a firearm?

16        A.   And after that I was on probation.

17   When they put me -- took me downtown, they put me

18   on probation for that.  And less than about four

19   or five years later, that's when I got charged

20   with possession of the firearm.

21        Q.   Okay.  So the possession of the firearm

22   was a separate occasion?

23        A.   Yes, sir.

24        Q.   Okay.  I'm sorry.  You didn't have a

25   firearm at the time of the arrest for drugs?

1    A.    No, sir.

2    Q.    Okay.  Did you make any kind of

3  complaint against the Hattiesburg Police

4  Department related to that arrest?

5    A.    No, sir.

6    Q.    Did you file any kind of lawsuit

7  related to that arrest?

8    A.    No, sir.

9    Q.    As I understand what you said before,

10  after you got out of the penitentiary, you were

11  on parole?

12    A.    No, sir.  I was on probation for the

13  possession of controlled substance.  But before

14  the sentence was up, I already -- when they put

15  me on probation, they said they were going to

16  "violate" me so I didn't ever go back to the

17  juvie probation officer.  So when they did catch

18  up with me, I had a pistol and they charged me

19  with possession of a firearm.

20    Q.    Okay.  I'm trying to catch up with you

21  just so I understand.  All right.  You get

22  arrested first for the possession of a controlled

23  substance?

24    A.    Yes, sir.

25    Q.    You don't remember what year that was,

1   though, right?

2        A.    No, sir.  I don't remember what year.

3        Q.    All right.  When you were arrested for

4   that, what were you sentenced to?

5        A.    Three years probation.

6        Q.    Okay.  So you didn't go to jail at that

7   point?

8        A.    No, sir.

9        Q.    Okay.  You get out and then at some

10  point you were later arrested again, right?

11       A.    With a possession of a firearm.

12       Q.    All right.  How long did that take?

13       A.    That was -- like I said, it was about

14  four or five years after I had been on, paper.

15       Q.    Okay.  So you were on probation, what

16  you said, on, paper?

17       A.    Yes, sir.

18       Q.    For about four years?

19       A.    Yes, sir.  They gave me three years,

20  but I didn't report like I was suppose to.  So

21  when they caught me with the pills that I had,

22  that charge plus the probation that I had

23  violate.  That's how I got nine years.

24       Q.    Okay.  How did you get caught with the

25  firearm?

A.    At the club, we -- one night we at the
club and we got ready to leave, and we got all
the guys in the car.  And the police pull us over
and they found a gun in my possession.

Q.    Okay.  All right.  What club were you
at that night?

A.    It was a club on Mobile Street.

Q.    The same one where the drugs occurred?

A.    Yes, sir.

Q.    All right.  What year was that?

A.    I can't remember.

Q.    All right.  Were you driving the car or
were you a passenger?

A.    No.  I was a passenger.

Q.    Okay.  Where were you at when you got
pulled over for that?

A.    At the Jr Food Mart on Main Street.

Q.    In Hattiesburg?

A.    Yes, sir.

Q.    Okay.  What agency pulled you over
there?

A.    Hattiesburg PD.

Q.    What happened during that arrest?

A.    They asked everybody to get out the
car.  And then when they searched everybody, they

1   found a pistol on me.  And then they take me

2   downtown for possession of a firearm after

3   convicted of a felony.

4        Q.   Was there any type of altercation

5   during that arrest?

6        A.   No, sir.

7        Q.   Do you remember who the officer was

8   that arrested you then?

9        A.   No, sir.

10       Q.   Do you remember any of the officers

11  that were present then?

12       A.   No, sir.

13       Q.   And so after they found -- let me ask

14  you this way.  At that point were you current

15  with your probation or had you not followed your

16  probation?

17       A.   I hadn't followed the probation.

18       Q.   Do you know if there was a warrant out

19  for your arrest at that point?

20       A.   Yes, sir.

21       Q.   Okay.  What was the problem with the

22  probation, just not reporting or was there

23  something else?

24       A.   Just not reporting.

25       Q.   All right.  Tell me what happened after

1    you were arrested.

2        A.    They just arrested me and sent me

3    upstairs.  And then a couple days, I'd seen

4    the --

5        Q.    When you say, upstairs, what do you

6    mean?

7        A.    That's when the county jail had an

8    elevator to go up to the third floor.

9        Q.    I didn't know if that meant the

10   penitentiary or what, when you said upstairs.

11       A.    I had to go upstairs on the elevator to

12   the third floor.

13       Q.    Okay.

14       A.    And about week or so later they took me

15   to court and they "violate" me and then I got a

16   lawyer with the case file on me.  And then the

17   lawyer and the DA come up -- well, they tried to

18   get me 20 years, and they work a deal and that's

19   when I did the nine years.

20       Q.    You were sentenced to nine?

21       A.    Uh-huh.  I had the three already on

22   probation and, you know, they give this sentence

23   and this sentence.  And when you go to the -- and

24   they put it all together and make one sentence

25   and made it nine years, total sentence.

1      Q.    Okay.  How long did you serve?

2      A.    Nine years.

3      Q.    So you served day for day?

4      A.    At the satellite in Pascagoula.

5      Q.    You didn't get any kind of early

6 release or anything like that?

7      A.    No, sir.

8      Q.    All right.  Other than the -- well, let

9 me ask you this.  The cocaine charge, that was a

10 three-year sentence, so that would have been a

11 felony?

12      A.    Yes, sir.

13      Q.    And then the firearm charge, were you

14 convicted of possession of a firearm?

15      A.    Yes, sir.

16      Q.    So that would have been a felony?

17      A.    Yes, sir.

18      Q.    All right.  Have you had any other type

19 of felony arrests?

20      A.    No, sir.

21      Q.    Had you been arrested for anything

22 else?

23      A.    No, sir.  Besides the incident just

24 happen in 2013.

25      Q.    Okay.  You don't have any other

1    arrests?

2        A.   No, sir.

3        Q.   May I ask about your father?  I

4    understand he was a retired officer.

5        A.   Yes, sir.

6        Q.   Where did he retire from?

7        A.   Perry County Sheriff's Department.

8        Q.   What year did he retire?

9        A.   Excuse me.  I don't remember what year

10   he retired.

11       Q.   How many years was he a sheriff's

12   deputy?

13       A.   Twenty-eight.

14       Q.   Did he do anything after he was a

15   sheriff's deputy?

16       A.   No, sir.

17       Q.   What about before?

18       A.   Before that he worked at Dee's Tire

19   Company.

20       Q.   In Hattiesburg?

21       A.   Yes, sir.  He worked there out of

22   Sear's, in the mechanic shop at Sear's.  And

23   that's the only places I remember him working at.

24       Q.   Okay.  Approximately when did he

25   retire?

1    A.    Around -- I'm going to say 2010 or '11,
2    to my knowledge.  I'm not for sure.
3    Q.    Was he ever in the military?
4    A.    No, sir.
5    Q.    Were you ever in the military?
6    A.    No, sir.
7    Q.    All right.  I asked about arrests.
8    Have you ever had any other encounter or
9    interaction with the Hattiesburg Police
10   Department other than what we've discussed?  In
11   other words, did you ever come into contact with
12   them, have any kind of bad experience with them
13   or any kind of encounter with an officer of
14   Hattiesburg Police Department?
15   A.    No, sir.
16   Q.    All right.  The arrest for the firearm,
17   did you make any kind of complaint with the
18   Hattiesburg Police Department?
19   A.    No, sir.
20   Q.    Was there ever any kind of lawsuit
21   filed with that?
22   A.    No, sir.
23   Q.    All right.  I'm going to ask you about
24   your medical history, because there's a claim for
25   physical injuries, so I'm going to ask you about

1   your medical history.  Have you ever had any type

2   of car accident in the past?

3        A.   No, sir.

4        Q.   Never been involved in a car accident?

5        A.   No, sir.

6        Q.   All right.  Have you ever been injured

7   in any kind of way?

8        A.   No, sir.

9        Q.   Have you ever had any kind of surgery?

10       A.   Beside my leg?

11       Q.   Related to this incident?

12       A.   Yes, sir.

13       Q.   Any other surgeries?

14       A.   No, sir.

15       Q.   Have you ever had back pains?

16       A.   Back pains?  No, sir.

17       Q.   Have you ever had neck pain?

18       A.   No, sir.

19       Q.   Have you ever seen a doctor for neck or

20   back?

21       A.   No, sir.

22       Q.   Have you ever been to the chiropractor?

23       A.   No, sir.

24       Q.   If you had to go to a doctor for a

25   cold, who would you go to?

1    A.    Forrest General emergency room.

2    Q.    You don't have like a general doctor

3 you would go to?

4    A.    No, sir.

5    Q.    All right.  When was the last time you

6 went to Forrest General?

7    A.    I believe it was probably 2015.

8    Q.    What was the reason for that visit?

9    A.    Yes.  I broke my -- back of my finger.

10    Q.    You pointed to your pinkie finger on

11 your left hand?

12    A.    Yes, sir.

13    Q.    How did you do that?

14    A.    I was moving some furniture outside and

15 my hand hit against the wall of the door frame,

16 and it went -- separated out and they said it

17 broke.

18    Q.    Any kind of surgery for that?

19    A.    No, sir.  Just put a cast on.

20    Q.    All right.  What about before that?

21 Not considering this event we're here for, but

22 what about before that?

23    A.    No, sir?

24    Q.    You haven't been to the doctor before

25 that?

1    A.    No, sir.

2    Q.    Do you have any type of medical

3  condition that you're on medication for?

4    A.    No, sir.  I grow up with a heart murmur

5  but that -- the doctor said I grow out of that.

6  I don't have to do nothing.

7    Q.    Okay.  You don't have diabetes, high

8  blood pressure?

9    A.    No, sir.

10   Q.    Are you otherwise healthy today?

11   A.    Yes, sir.

12   Q.    You're not having any problems today?

13   A.    No, sir.

14   Q.    Medical problems?

15   A.    No, sir.

16        MR. DOSSETT:  I'll take just a brief

17   break.

18             (OFF THE RECORD.)

19  BY MR. DOSSETT:

20   Q.    Wade, let me ask a couple more

21  questions about your father.  Going back, you

22  said that evening or that day Emma

23  C-o-l-q-u-i-t-t, I don't know how you say it --

24  but she --

25   A.    When I was outside I was saying, I just

1  thinking --

2       MR. CARTER:  Let him -- okay.  I'm

3  sorry.

4       A.    -- that Emma is -- that's another Emma.

5  That's my cousin.  But the Emma what I was

6  thinking about was Raymond's mother.  Her name is

7  Curr.  I think it's spelled C-u-r-r.

8  BY MR. DOSSETT:

9       Q.    Curr?

10      A.    Yes, sir.  That's my cousin, Emma,

11  right there.  Her name is Emma McNair, but that's

12  her maiden name.  I was just thinking about that

13  outside.

14      Q.    You gave me lots of information.  Let

15  me try to go back so I can understand what you

16  said here.  All right.  That night, April 16th,

17  2013, was your father, George, was he married at

18  that time?

19      A.    No, sir.

20      Q.    Okay.  He was not married?

21      A.    No, sir.

22      Q.    All right.  The lady that he was

23  seeing, was she at your house?

24      A.    Yes, sir.  Emma Curr.

25      Q.    And you think you spell her last name

1    C-u-r-r?

2         A.   Yes, sir.

3         Q.   Okay.  And is that the person you don't

4    know where she is?

5         A.   That's the person, yes, sir.

6         Q.   Okay.  Do you have her phone number?

7         A.   No, sir.

8         Q.   All right.  How long has it been since

9    you talked to her?

10        A.   Since my father passed, I haven't seen

11   her.  After that, I haven't seen her.

12        Q.   Okay.  You don't know if she's in town

13   or not?

14        A.   No, sir.

15        Q.   All right.  Now, in your discovery

16   responses you identified an Emma C-o-l-q-u-i-t-t,

17   Colquitt?

18        A.   That's my cousin, Emma.

19        Q.   And her full name is Emma McNair

20   Colquitt?

21        A.   Yes, sir.

22        Q.   All right.  And how old is she?

23        A.   Fifty-two.

24        Q.   Okay.  Was she at your house that day?

25        A.   No, sir.

1    Q.   Okay.  Does Emma Colquitt, as
2  identified in your discovery responses, it says
3  she was the companion of George, Sr. and was
4  present at the scene; that's not correct?

5    A.   That's Emma Curr.

6    Q.   C-u-r-r?

7    A.   Yes, sir.

8    Q.   Okay.  Does Emma Colquitt, does she
9  known anything about what happened to you or that
10  night?

11   A.   No, sir.  She just -- she worked at the
12  Forrest General Hospital.

13   Q.   Okay.  Did she come to see either of
14  you or your dad at the hospital?

15   A.   My dad.

16   Q.   Okay.  Going back to your dad, George
17  Wade, Sr., had he had any medical problems before
18  this event?

19   A.   He just had -- taking blood pressure
20  pills.

21   Q.   Anything else?

22   A.   No, sir.

23   Q.   Had he ever had a problem with his neck
24  or back?

25   A.   No, sir.

1    Q.    Had he ever been involved in any kind
2    of accident?
3    A.    Well, he had had a car wreck and I
4    think that was in 2006, I believe, or 2008.
5    Q.    Do you know what he injured in that
6    accident?
7    A.    His left leg.
8    Q.    At the time he passed in 2016, how old
9    was he?
10   A.    Seventy-four.
11   Q.    All right.  Let's go back now -- well,
12   a couple follow ups on your dad.  Was your dad
13   ever arrested for anything?
14   A.    No, sir.  Not to my knowledge.
15   Q.    Okay.  Had he ever had a workers'
16   compensation claim?
17   A.    Not to my knowledge.
18   Q.    All right.  Had he ever been on Social
19   Security disability?
20   A.    No, sir.  He was just on Social
21   Security.
22   Q.    All right.  Have you ever filed a
23   workers' compensation claim?
24   A.    No, sir.
25   Q.    All right.  Have you ever been on

1    Social Security disability?

2        A.    No, sir.

3        Q.    All right.  Had you ever filed any

4    other kind of lawsuit?

5        A.    No, sir.

6        Q.    Have you ever been sued?

7        A.    No, sir.

8        Q.    What about your dad, had he ever filed

9    a lawsuit?

10       A.    Not to my knowledge.

11       Q.    All right.  Has he ever been sued?

12       A.    No, sir.

13       Q.    What about bankruptcy, have you ever

14   filed bankruptcy?

15       A.    No, sir.

16       Q.    Do you know if your dad ever filed

17   bankruptcy?

18       A.    Not to my knowledge.

19                 (OFF THE RECORD.)

20   BY MR. DOSSETT:

21       Q.    Okay.  Did you have any family members

22   who lived around you on Cherry Street?

23       A.    Family members?  No, sir.

24       Q.    All right.  What about neighbors who

25   saw anything?

```
1        A.    No, sir.
2        Q.    Do you ever talk to anybody, as far as
3   a neighbor goes, who said I saw what happened
4   that night?
5        A.    No, sir.
6        Q.    And you're not aware of anybody ever
7   coming forward saying they saw anything?
8        A.    No, sir.
9        Q.    Have you spoken to anyone who lives in
10  your area about this?
11       A.    No, sir.
12       Q.    Okay.  All right.  Let's go back to
13  April 16th, 2013, as I understand, was when this
14  happened.  I understand it happened at 2104,
15  that's military time.  I think that's around 9:00
16  in the evening?
17       A.    Yes, sir.
18       Q.    All right.  Does that sound about
19  right?
20       A.    I really don't recall.
21                  (OFF THE RECORD.)
22  BY MR. DOSSETT:
23       Q.    All right.  That day, April 16th, had
24  you worked that day?
25       A.    Yes, sir.
```

1    Q.   All right.  Where were you working at

2 that time?

3    A.   Loresco.

4    Q.   Okay.  And what was your position at

5 that time?

6    A.   I was -- I worked then in the warehouse

7 stacking bags.

8    Q.   And what time did you get off work?

9    A.   5:00 o'clock.

10    Q.   Okay.  What happened after you got off

11 work?

12    A.   I went by my father's house, picked him

13 up and brought him to my house and told my wife

14 to get ready, we're going to go to eat.  I took a

15 shower and me and my father and my wife; my baby,

16 Tavares; and Emma; we went out to eat at Golden

17 Corral.

18    And after we come back from Golden

19 Corral, we all went back home.  And I asked my

20 dad was he ready to go?  He said, no.  So we sit

21 around and they were -- well, we were starting to

22 play cards.  That's our family thing, we play

23 cards.

24    Q.   Okay.  Let me slow you down a little

25 bit.  When you got off work, you went and picked

1  your father up?

2       A.   Yes, sir.

3       Q.   All right.  You picked Emma up, as

4  well?

5       A.   My father.

6       Q.   You picked Emma up with your father?

7       A.   Yes, sir.

8       Q.   Okay.  Emma Curr?

9       A.   Yes, sir.

10      Q.   And you brought them to your house?

11      A.   Yes, sir.

12      Q.   And that was on your way home?

13      A.   Yes, sir.  On the way home.

14      Q.   And I didn't ask you:  Where is Loresco

15  located?

16      A.   On Airport Road by the same airport

17  right beside the airport on the right.

18      Q.   So that would have been close to where

19  your father lived?

20      A.   Right up the street, yes, sir.

21                 (OFF THE RECORD.)

22  BY MR. DOSSETT:

23      Q.   And what time did you leave to go to

24  Golden Corral?

25      A.   I'd say it was around about 6:00, 6:15.

1    Q.    Was it Golden Corral at the time or was

2    it another restaurant?

3    A.    I believe it was Golden Corral.  I'm

4    not for sure.

5    Q.    The one in front of Walmart?

6    A.    Yes, sir.

7    Q.    And on Highway 98?

8    A.    Yes.  By the same Walmart?

9    Q.    Yes, sir.

10   A.    Right there.

11   Q.    Okay.  Up till that point, had you had

12   any alcoholic beverage to drink?

13   A.    I had one drink when I got to the

14   Golden Corral.

15   Q.    Do they serve alcohol at Golden Corral?

16   A.    No, sir.  I had me a beer.

17   Q.    With you?

18   A.    Yes, sir.

19   Q.    Did you get that from your house or did

20   you pick it up somewhere?

21   A.    At the store, when I stopped at the

22   store to get gas, Jr Food Mart.

23   Q.    And what kind of beer was that?

24   A.    Bud Light.

25   Q.    What size?

1    A.    Sixteen ounce.

2    Q.    Okay.  What time did you finish eating?

3    A.    I -- well, I really can't recall but I

4    think we got home about 8:00, 8:15.

5    Q.    All right.  Did you stop anywhere

6    between the restaurant and your house?

7    A.    No, sir.  Not that I recall, no.

8    Q.    Before you got home, had you had

9    anything else to drink?

10   A.    No, sir.

11   Q.    All right.  What time did you start

12   playing cards?

13   A.    It was around probably about 8:30.

14   Q.    What card game were you playing?

15   A.    Tonk.

16   Q.    I haven't heard of that one.

17   A.    It's like three of a kind, like poker.

18   Q.    Okay.  Who all was playing cards?

19   A.    Me and my wife and I think Gennifer was

20   playing.  Yeah.  Me and my wife and Gennifer.

21   Q.    Okay.  And going back, who went to the

22   restaurant with you?

23   A.    My dad and Emma and Tavares and my

24   wife, Susa.

25   Q.    Okay.  So did y'all ride in the same

1  vehicle?

2       A.    Yes, sir.

3       Q.    You, your wife, your dad, and Emma?

4       A.    And Tavares.

5       Q.    Okay.  Five of you?

6       A.    Yes, sir.

7       Q.    Okay.  Did you meet anybody at the

8  restaurant?

9       A.    No, sir.

10      Q.    All right.  How long did you play

11 cards?

12      A.    Well, we really didn't -- when we

13 started playing, me and my wife get into a little

14 argument.  So when we get into the argument, we

15 was face to face, and I was -- when I pushed her

16 out my face, like go on and get back.  That's

17 when George stepped in my face and me and him had

18 a few words arguing.

19            Then that's the time my wife called the

20 police.  When she had called the police, that's

21 when my dad stepped up and told me to go outside.

22 And so I went outside to sit on the porch while

23 he was in there talking to George.

24      Q.    All right.  Those who were playing

25 cards, you and your wife?

1     A.    And Gennifer.

2     Q.    Just three of y'all?

3     A.    Yes, sir.

4     Q.    While you were playing cards, you and

5 your wife got into an argument?

6     A.    Yes, sir.

7     Q.    What was the argument about?

8     A.    I really don't remember.  Just

9 something about the cards and we just start

10 arguing and then we stood up and, as we stood up,

11 we were face to face.  And when I push her out my

12 face, that's when George pushed up between us.

13 And me and him start arguing, you know what I'm

14 saying, and then we were arguing.  That's when my

15 dad told me to go outside.

16     Q.    Okay.  Where were you arguing at?

17     A.    In the kitchen.

18     Q.    Is that where you were playing cards?

19     A.    Yes, sir.

20     Q.    All right.  Did your wife push you back

21 or anything like that?

22     A.    No, sir.

23     Q.    What happened after you pushed her?

24     A.    That's when George came between us.

25 And when he came between us, me and him start

1   arguing.  So when me and him start arguing,

2   that's when my dad like pull us apart and told

3   me, boy, go outside and sit down.

4        Q.   Did you push George?

5        A.   Huh-uh (negative response).

6        Q.   Or did he push you?

7        A.   No, sir.  We were just arguing.

8        Q.   What were you arguing about?

9        A.   Told me don't put my hands on his

10  momma.

11       Q.   And what did you say back to him?

12       A.   I tell him this is my house, you ain't

13  grown and you don't run nothing in here, get

14  back, you know, just like that.  And, like I

15  said, by that time my dad stepped in and that's

16  when I went outside on my porch.

17       Q.   Your dad told you to go outside?

18       A.   Yes, sir.

19       Q.   All right.  Did anybody go outside with

20  you?

21       A.   No, sir.  He was talking to George at

22  that time.  And then, after he got through

23  talking to George -- that's the rest of the time

24  I believe George had left, if I remember

25  correctly, he had left.

1    Q.    So he come outside and left?

2    A.    Yes.  Him and Gennifer had left.  I

3    think she took him somewhere to the store.

4    Q.    How long were you outside?

5    A.    About 30 minutes.

6    Q.    What were you doing while you were

7    outside?

8    A.    Sitting on the porch.

9    Q.    All right.  From the time when you got

10   outside and you were sitting on the porch, were

11   you drinking anything?

12   A.    No, sir.

13   Q.    How much had you had to drink up to

14   that point?

15   A.    That one 16 ounce.

16   Q.    One 16 ounce?

17   A.    Uh-huh (affirmative response).

18   Q.    And you did not have anything to drink

19   after dinner?

20   A.    No, sir.

21   Q.    What about liquor, had you drank any

22   kind of liquor, any kind of alcohol that day

23   other than that one beer?

24   A.    No, sir.

25   Q.    All right.  What about your wife?

1    A.   She don't drink.

2    Q.   All right.  Did she have anything to

3   drink that day?

4    A.   No, sir.

5    Q.   George, had he had anything to drink?

6    A.   Not to my knowledge.  At the time, he

7   shouldn't have been drinking.

8    Q.   All right.  What about your father?

9    A.   He didn't drink.

10    Q.   Had he had anything to drink that day?

11    A.   No, sir.

12    Q.   As far as you're aware, the only

13   alcohol that was consumed between those people

14   that day was your one beer?

15    A.   Yes, sir.

16    Q.   What happened after you went outside?

17    A.   I was just sitting on the porch waiting

18   till the police arrived.

19    Q.   Okay.  Did you know the police were

20   called?

21    A.   Yes, sir.

22    Q.   How did you know the police was called?

23    A.   I heard my wife on the phone talking to

24   the police, and she told me she was calling the

25   police.

1    Q.    What did she say to you?

2    A.    She said y'all don't fight because I'm

3    calling the police.

4    Q.    Okay.  After that, what happened?

5    A.    That's when I went outside.  That's

6    when my dad told me to go outside, and I went

7    outside to sit on the porch.

8    Q.    Okay.  You waited on the porch for

9    about 30 minutes?

10   A.    Yes, sir.

11   Q.    And then George left?

12   A.    Yes, sir.

13   Q.    With Gennifer?

14   A.    Yes, sir.

15   Q.    What happened after that?

16   A.    Well, after that, the police arrived.

17   When the police arrive -- which was Officer

18   Breland.

19   Q.    He arrived by himself?

20   A.    I believe he was by himself, yes, sir.

21   Q.    Okay.  What happened when he arrived?

22   A.    He told me to come here.  And I told

23   him come to me.

24   Q.    And where was he at?

25   A.    In the yard.  He was standing outside

1    in my yard.

2        Q.   And where were you at?

3        A.   Still on the porch.

4        Q.   When you say, porch, I haven't

5    obviously seen your house.  Describe what that is

6    for me.

7        A.   Well, it's like a little deck about --

8    I'd say 10 by 10 deep with a little roof on it,

9    no screen, no nothing.  Steps come up and into

10   the house.

11       Q.   How far off the ground is it?

12       A.   I'd say -- I think to this table.

13       Q.   Three or four feet?

14       A.   This table about three or four feet,

15   I'd say.

16       Q.   And your deck is about three or

17   four feet?

18       A.   Yes, sir.

19       Q.   Was anyone else on the deck with you

20   when the officer arrived?

21       A.   My wife came outside when the police

22   arrived and my dad, too.

23       Q.   Okay.  Was anyone else outside?

24       A.   Not to my knowledge.

25       Q.   None of your children were outside?

1       A.    No, sir.

2       Q.    Okay.  And at that point George and

3  Gennifer had left?

4       A.    Yes, sir.

5       Q.    All right.  Officer Breland came and

6  got out of his car.  And was he standing by his

7  car when he told you to come to him?

8       A.    He was in my yard.  His car was parked

9  half in the yard and half in the street, and he

10  got out the car and he told me to come here.

11       Q.    And what did you say to him?

12       A.    Told him come to me.

13       Q.    What happened after that?

14       A.    My dad said, go see what he want.  So

15  when I got up to go towards him to see what he

16  wanted, he asked me what's going on.

17            And I was trying to explain to him that

18  I wasn't going to let my kids disrespect me in my

19  house.  And he just walked around and he looked

20  at me.  And, before I know it, the next thing I

21  know, he had kicked me on my leg and slammed me

22  to the ground and smashed my head on the

23  concrete, rolled my face into the concrete and

24  put the handcuffs on me.

25            That's when I heard my father say, hey,

1   man, look, showing his badge, say, I'm an officer
2   of the law, too.  That's wrong how you doing my
3   son.  And after that, he tell my dad to step
4   back.
5       Q.   Okay.  Let me slow you down.  Let's go
6   back to your encounter, initial encounter.
7   Officer Breland said that you had told him, I'm
8   not going anywhere because I haven't done shit;
9   is that what you said to him?
10      A.   No, sir.  No, sir.  No, sir.  I didn't
11  say that to him.
12      Q.   What did you say to him?
13      A.   Like I was saying, I was trying to
14  explain to him --
15      Q.   No.  Before that.  I'm talking about
16  when you were on the porch and he's in the yard,
17  and you said, you come to me.
18      A.   That's all I said, you come to me.
19      Q.   You didn't say, I'm not going anywhere
20  because I didn't do shit?
21      A.   No, sir.
22      Q.   What were the words you used?
23      A.   I told him, you come to me.  That's
24  what I told him.
25      Q.   All right.  When you came down to

1    Officer Breland, where did you go?

2        A.    I walked straight to him and right in

3    front of him in the yard.

4        Q.    All right.  What did he say to you?

5        A.    He asked me what was going on.  And I

6    was telling him, I said, I wasn't going to let my

7    children run my household and let them disrespect

8    me in my household.  And he was like that, with

9    his hand on his chin.  He was walking around and

10   then he looked around, and then he came around

11   towards me on the side, and he just kicked me on

12   my leg and grabbed me and throw me to the ground.

13       Q.    Did Officer Breland ask you to come

14   over to his car?

15       A.    No, sir.

16       Q.    He never told you to step away and come

17   over to his car?

18       A.    Huh-uh.  No, sir.

19       Q.    Did Officer Breland ever try to escort

20   you to his car?

21       A.    No, sir.

22       Q.    All right.  Did Officer Breland try to

23   grab your hand to pull you towards his car?

24       A.    No, sir.

25       Q.    Did he ever grab your wrist?

1      A.    No, sir.

2      Q.    Officer Breland says that he tried to

3   grab your wrist to pull you towards the car.

4   What's your response to that?

5      A.    He didn't grab my arm, pull me nowhere.

6      Q.    Did you ever try to pull away from his

7   grip?

8      A.    No, sir.  He never gripped me.

9      Q.    After you told him you weren't going to

10  let your kid run your household, what happened?

11     A.    That's when he kicked me.

12     Q.    He just kicked you out of the blue?

13     A.    Just out of the blue and nothing else,

14  just kicked me on my leg, grabbed me, throw me to

15  the ground and smashed my face into the concrete

16  and put the handcuffs on me.

17     Q.    Where did he kick you?

18     A.    On my left leg.

19     Q.    Where at on your left leg?

20     A.    On the side where my kneecap is.

21     Q.    He kicked you near your knee?

22     A.    On the side of my kneecap, yes, sir.

23  On the side, not in front of the knee, on the

24  side of my kneecap.

25     Q.    What did he kick you with?

1    A.    His feet.

2    Q.    All right.  Was it his left leg, right

3    leg?

4    A.    I can't remember.

5    Q.    How did he kick you?

6    A.    He kicked me sideways like this

7    (indicating) like kick down.

8    Q.    All right.  So he kicked in a downward

9    motion?

10    A.    Yes, sir.  When he kicked me like that,

11    he kicked down.

12    Q.    All right.  Had he touched you at any

13    point prior to that?

14    A.    No, sir.

15    Q.    He didn't grab your arm?

16    A.    No, sir.

17    Q.    Had he in any way tried to handcuff

18    you?

19    A.    No, sir.

20    Q.    The only thing he had said to you,

21    prior to that point was, what happened?

22    A.    Yes, sir.

23    Q.    What happened after he kicked you?

24    A.    After he kicked me and put the

25    handcuffs on me --

1    Q.    Well, let me slow down.  When he kicked
2    you, did you go to the ground or were you still
3    standing?
4    A.    I was still standing.  When he kicked
5    me, I was standing like that.  I was like, oh,
6    and that's when he grabbed me, throw me to the
7    ground.
8    Q.    How did he grab you?
9    A.    Round my side with both my arms -- I
10   didn't have no arms, hands or nothing.  He had me
11   wrapped like round -- I couldn't move my hands or
12   nothing.
13   Q.    You're saying he bear-hugged you?
14   A.    Yes, sir.
15   Q.    Okay.  Did he bear-hug you from the
16   front or the back?
17   A.    I believe it was from the side, like on
18   this side when he grabbed me.
19   Q.    And you're saying your left side?
20   A.    Yes, sir.
21   Q.    And he took you to the ground?
22   A.    Yes, sir.
23   Q.    All right.  Were you in the yard?
24   A.    Yes, sir.
25   Q.    So you landed in the grass?

A.    Well, it's -- my yard is like, well, it has grass in it and dirt and the concrete is right beside on the side there.

Q.    But you landed in the grass, in the dirt area?

A.    Yes, sir.  The dirt area, yes, sir.

Q.    All right.  What happened after that? All right.  Let me ask you this:  When he grabbed you around your waist like that and take you to the ground, did he go to the ground, too?

A.    Yes, sir.

Q.    So y'all both fell to the ground?

A.    Yeah.  He throw me to the ground and he was on top of me.  That's when he grab my head and smashed it into the concrete like that (indicating) and throw the handcuffs on me.

Q.    All right.  But you landed in the dirt?

A.    Yes, sir.

Q.    All right.  And immediately after that, he put handcuffs on you?

A.    Yes, sir.

Q.    Did you say anything to him while this was happening?

A.    I couldn't say nothing.  I was just hollering.

1     Q.    What were you hollering?

2     A.    Oh, oh, my leg is broken, it's broke.

3    Like that.

4     Q.    Referring to your left leg where he

5    kicked you?

6     A.    Yes, sir.

7     Q.    All right.  After he put handcuffs on

8    you, did he touch you in any way?

9     A.    No, sir.

10     Q.    All right.  So other than what we just

11   discussed, was there any -- other than that, was

12   there any physical involvement between you and

13   Officer Breland?

14     A.    No, sir.

15     Q.    All right.  What was it that broke your

16   leg?

17     A.    It had to be the kick.  .

18     Q.    All right.  When he kicked you, that

19   was the only physical interaction while you were

20   standing?  You understand, right?

21     A.    Yes, sir.

22     Q.    All right.  That kick, is there any

23   other physical thing that happened to your leg

24   other than that kick?

25     A.    No, sir.

1    Q.    All right.  Was he holding or grabbing
2    your wrist when he kicked you?
3    A.    No, sir.
4    Q.    Was he holding your body when he kicked
5    you?
6    A.    No, sir.
7    Q.    Was he touching you in any way?
8    A.    No way.  No, sir.
9    Q.    After you were on the ground, he didn't
10   kick you or hit you?
11   A.    No.  Just smashed my head into the
12   concrete -- I mean, into the ground.  That's all
13   he did until he come back to put me in the car.
14   Q.    But there was no other physical
15   interaction you had with Officer Breland?
16   A.    No, sir.  Until he come out the house.
17   Q.    What happened after he came out the
18   house?
19   A.    When he came out the house, they put me
20   into the police patrol car.  And I told him I
21   couldn't walk, so him and the lady, the female
22   officer stood me up and she went on the other
23   side to pull me in the car.  And, as I was
24   getting in the car, he kicked me in my privates.
25   Q.    He kicked you in your privates?

1    A.    Yes, sir.

2    Q.    He being who?

3    A.    Officer Breland.

4    Q.    All right.  How did they load you in

5    the car?

6    A.    Him and the female officer, they put me

7    up to the door, open the door, sit me on the

8    seat.  And she from behind pulled me up by my

9    shoulder and, as she was pulling me in, he kicked

10   me in my privates and throw my leg up like that

11   and slam the door.

12   Q.    Do you know who the lady was that

13   loaded you in the car?

14   A.    No, sir.  All I know she was a short,

15   white female with short hair.  That's all I know.

16   Q.    Do you know about how old she was?

17   A.    No, sir.

18   Q.    Was anybody else that you saw standing

19   around when this happened?

20   A.    No, sir.  When they went inside the

21   house, that's when my daughter Taneshia pulled

22   up.  And I told her to come help me up, but she

23   was scared to come help me up, and that's the

24   only person I'd seen.  And my wife and my

25   daughter, they were still over by the steps.

1     Q.   Other than that, was there any physical
2    interaction between you and Officer Breland?

3     A.   No, sir.

4     Q.   Was there any other physical
5    interaction, in other words, any contact, between
6    you and any other officer at any point other than
7    what you just mentioned?

8     A.   No, sir.

9     Q.   Officer Narottam Holden, did he at any
10   point touch you?

11    A.   No, sir.

12    Q.   Did you see Officer Holden at any
13   point?

14    A.   No, sir.

15    Q.   Did you ever speak to him?

16    A.   No, sir.

17    Q.   Did he ever speak to you?

18    A.   Not to my knowledge, no, sir.

19    Q.   And, again, Officer Holden never
20   touched you?

21    A.   No, sir.

22    Q.   Going back to when you were laying on
23   the ground, how were you laying on the ground?

24    A.   I was laying with my hands behind my
25   back on my side like this to the right side.

1      Q.    Okay.  At that point while you were

2   laying on the ground, who was outside?

3      A.    When I was first on the ground when he

4   first put the handcuffs on me, my dad was

5   standing right there by my truck.  And he told my

6   dad to back up.  Then after he told my dad to

7   back up, all I remember him spraying him.  After

8   he sprayed him, that's when my dad stumbled back

9   towards the house.

10          And by the time he get inside the

11  house, that's when my daughter pulled up on the

12  side of the house.  She didn't pull in the yard,

13  she pulled on the street.  And then I called her

14  to come help me up, but she didn't come help me

15  up because she said the police might put her in

16  jail.

17     Q.    And what daughter was that?

18     A.    Taneshia.

19     Q.    Taneshia.

20     A.    Yes, sir.

21     Q.    While you were on the ground, what did

22  your dad say to the officer?

23     A.    He told him that was wrong how you was

24  doing his son, he's a police officer, too.  And

25  by that time he told him to back up, so my dad

was backing up towards the truck.  I remember him
spraying -- I don't know if he had pulled his gun
out at that point in time or nothing.  I didn't
really see that part.  All I know I seen him
spray him because that's all I seen.

Q.   All right.  You were on the ground
facing the dirt?

A.   Yes, sir.

Q.   All right.  Do you know if your dad
ever touched Officer Breland?

A.   Not to my knowledge, no, sir.

Q.   You couldn't see behind you, could you?

A.   I could see the view, but I didn't see
my dad put his hands on Officer Breland.

Q.   All right.  If he did or didn't, you
wouldn't know because you couldn't see that,
correct?

A.   I could see the view.  Like I said, if
he had put his hands on him, they had been
tussling, I could have saw.

Q.   I'm talking about while you were on
your stomach and Officer Breland is handcuffing
you, right?

A.   Yes, sir.

Q.   He's behind you?

1    A.    Yes, sir.

2    Q.    And your dad is also behind you?

3    A.    My dad is, yes, sir.  He behind me,

4    too.

5    Q.    All right.  So what happened behind you

6    between your dad and Officer Breland, you

7    couldn't see that?

8    A.    No, sir.  I couldn't see that, no, sir.

9    Q.    Until they moved away?

10    A.    Yes, sir.

11    Q.    So when your dad is talking to Officer

12    Breland and Officer Breland is saying, get back,

13    you couldn't see him at that point?

14    A.    Yes, sir.  I saw him at that point.

15    Q.    All right.  At what point could you see

16    him?

17    A.    When he turned me -- when he had put

18    the handcuffs on me and I heard him tell my dad

19    to back up, back up.  And that's when I looked

20    like this towards the house.

21    Q.    All right.  Before that point, before

22    you said, he said back up, back up, you couldn't

23    see or you don't know what happened?

24    A.    I don't know what went on between that

25    time.

1     Q.   Okay.

2     A.   Because I was facing, my face was

3 facing the street.

4     Q.   And that's while you were being

5 handcuffed?

6     A.   Yes, sir.  While he was putting

7 handcuffs on me.

8     Q.   All right.  When he turned loose of you

9 and he finished handcuffing you, what did Officer

10 Breland do at that point?

11     A.   That's when he was telling my dad to

12 back up.

13     Q.   Okay.  What happened at that point?

14     A.   I recall him spraying the Mace in my

15 father's face.  And after that, my father had

16 fell, like stumble back to the truck, and I seen

17 him going towards the house.

18          When he ran into the house, that's when

19 my wife tried to go in there behind him to see

20 what was wrong with him.  But Officer Breland at

21 that time had pulled his pistol and told them to

22 stay right there, that they couldn't come inside.

23     Q.   All right.  Did Officer Breland pull

24 his pistol before or after he sprayed your

25 father?

1    A.    It had to be after because all I'd seen
2    was him do this here (indicating).  And then,
3    after I seen him do that, he follow him to the
4    step and I seen him turn like this here and tell
5    my wife and them, don't y'all move, y'all can't
6    come here.

7         I don't know if he had the pistol going
8    up towards the step because I couldn't really see
9    what was in his hands after he did the spraying.
10   Q.    All right.  So from the time he stood
11   up to the time he sprayed him, you don't know if
12   he had a gun or not?
13   A.    Not in his hand at that time, no, sir.
14   All I remember when he -- all I seen when he got
15   to the step, that's when he turned around with
16   the gun towards my wife and my daughter.  Like I
17   said, I don't know if he pulled it out when he
18   got to at that point or if he had it before he
19   got to that point.  I don't know.
20   Q.    All right.  How was he holding the gun?
21   A.    He was holding it like this.
22   Q.    Straight down pointing to the ground?
23   A.    I think he was pointing it just like
24   this in front of him, not down or not up, just
25   straight just like this.

1    Q.   Okay.  Was he pointing it at anyone in
2    particular?

3    A.   I believe my wife and daughter.
4    Because, like I said, they were on the corner and
5    he was on the step.  And when he turn around like
6    this, that's when I'd seen the gun and he was
7    talking to them.  I don't know if he was pointing
8    it direct at them, but I know he had the gun in
9    his hand.

10    Q.   Okay.  When he went up the stairs, do
11    you know if he had the gun or not?

12    A.   That's what I said, I don't know if he
13    had the gun.  But when he was on the step and he
14    turned around to talk to my wife and them, I seen
15    the gun.  But I don't know if he pulled the gun
16    going up the step or if he had it on the steps.

17    Q.   All right.  After he left, went beyond
18    the steps, you don't know what he did with the
19    gun as far as putting it back?

20    A.   No, sir.  I don't know what he did with
21    the gun, if he put it back or if he went in with
22    it in his hand or what.

23    Q.   All right.  While your dad was walking
24    towards the house, what was Officer Breland
25    saying to him?

A.   I don't remember him saying nothing to him.  I didn't hear him say nothing to him.  I didn't hear him say nothing to him.

Q.   All right.  Your dad, was he saying anything while he was going towards the house?

A.   Not to my knowledge.  I didn't hear him say anything.

Q.   You didn't hear anybody, anything between your dad and Officer Breland as they went towards the house?

A.   No, sir.

Q.   You don't know what any one of them said to each other?

A.   No, sir.

Q.   You don't know if Officer Breland told him to stop?

A.   No, I don't know.

Q.   You don't know if your dad said anything in response?

A.   No, sir.

Q.   Do you know why your dad was going in the house?

A.   To go to the bathroom and get that Mace out his eye.

Q.   Did he say that?

1    A.    I know that's what he went to do.

2    Q.    I understand.  But did he say that?

3    A.    Oh, no, sir.  He didn't say that.

4    Q.    He never said, I'm going to the

5  bathroom to rinse my eyes?

6    A.    No, sir.  He didn't never say anything.

7  I didn't hear him say anything.

8    Q.    All right.  The lawsuit that you filed

9  said he stumbled towards the front door and

10  then -- let's see.  I'm sorry, not the lawsuit.

11  There is a statement from Emma Curr that says he

12  went into the house to get his ID.

13        I'm going to show that to you here.

14        MR. CARTER:  Can I see that?

15        MR. DOSSETT:  We'll mark this as

16    Exhibit 1.

17        (EXHIBIT 1 MARKED.)

18  BY MR. DOSSETT:

19    Q.    And this is Emma Curr, this would be

20  your dad's girlfriend?

21    A.    Yes, sir.

22    Q.    All right.  You see where it says, he

23  went in the house to get his ID?

24    A.    Yes.  I see that.

25    Q.    All right.  Do you know if that's why

1    he went in the house, to get his ID?

2       A.    No.   He already -- he had his badge in

3    his hand so I'm sure he didn't need no ID.   If he

4    needed ID, he would have it on him because he

5    don't stay there.

6       Q.    Do you know if his ID had any name on

7    it, as far as his name, or any personal

8    identifier on it?

9       A.    What you mean?

10      Q.    His badge.

11      A.    Yeah.   It had George Wade and Perry

12    County Deputy Sheriff.

13      Q.    It had his name on it?

14      A.    Yes, sir.

15      Q.    Did he have a wallet inside the house?

16      A.    No, sir.   He had it in his pockets.

17      Q.    So this statement about him going

18    inside to get his ID would be incorrect?

19      A.    To my knowledge, that's incorrect.

20      Q.    Did you ever ask your dad why he went

21    inside?

22      A.    No, sir.

23      Q.    This interaction between you and

24    Officer Breland where he kicked you, did you ever

25    physically resist him or push him?

1    A.    No, sir.

2    Q.    All right.  Did you ever refuse to be

3 arrested?

4    A.    No, sir.  He never did say nothing

5 about arrest.

6    Q.    All right.  Did you ever hit or kick

7 him?

8    A.    No, sir.

9    Q.    Did you ever verbally resist him, other

10 than the statement:  I'm not going to come off

11 the porch, you come to me?  Did you ever say

12 anything to him about how you weren't going to go

13 to jail or be arrested?

14    A.    No, sir.

15    Q.    Other than the statement that you made

16 to him about, I'm not going to let my kids run my

17 household, did you say anything else to him?

18    A.    No, sir.

19    Q.    Was there any other words between the

20 two of you?

21    A.    No, sir.

22    Q.    Okay.  Did you see your dad as he was

23 going up the stairs?

24    A.    Yes, sir.

25    Q.    All right.  What was he doing as he was

1  going up the stairs?

2       A.    He had his hands were up to his face

3  was all I can see and him going up the stairs.

4       Q.    Officer Breland says that he saw your

5  father reach in his waistband area; did you see

6  that?

7       A.    No, sir.

8       Q.    All right.  Did you see him reach in

9  his pocket?

10      A.    No, sir.  Not for -- other than his

11 wallet, before he come off the porch.

12      Q.    Okay.  You did see him reach for his

13 wallet?

14      A.    On the porch when he got his -- like

15 went in his pocket and got his badge thing and

16 was showing it to Officer Breland.

17      Q.    Was that like a metal badge like a star

18 like you see some police flip open like this?

19      A.    It was round.  It was round.

20      Q.    Okay.  Was it a metal badge or was it

21 an ID bade like --

22      A.    Like -- well, I can't really recall.

23 All I know it had his name on it, Perry County

24 Sheriff's Department.  I know he had two of them.

25 I don't know which one he showed to him.

1    Q.    Was it like a driver's license thing
2    like an ID, or was it the round silver badge?
3    You don't know?
4    A.    I don't know which one it was.  All I
5    seen him put his hand up like this and then tell
6    him, trying to show him that.
7    Q.    All right.  Did you ever hear Officer
8    Breland say, get your hands up?
9    A.    No, sir.  All I heard Officer Breland
10   say is step back.
11   Q.    All right.  As far as any conversation
12   he had with your dad after that point, you don't
13   know what was said?
14   A.    No.  I don't know what was said, none
15   of that.  No, sir.
16   Q.    All right.  And you didn't see your dad
17   reach in his waistband?
18   A.    No, sir.
19   Q.    Did your dad have a gun on him?
20   A.    Not to my knowledge.  No, sir.
21   Q.    Did you see your dad at any point that
22   evening with a gun?
23   A.    No, sir.
24   Q.    All right.  Is it a normal practice for
25   your dad to have a gun?

1    A.    No, sir.  Not around home or nothing
2    like that.
3    Q.    He doesn't normally carry a gun with
4    him?
5    A.    No, sir.
6    Q.    All right.  What about any other type
7    of weapon, does he normally keep like a knife or
8    Mace or anything on his person?
9    A.    No, sir.
10   Q.    All right.  At that point, as they're
11   going up the stairs, did you say you saw your
12   father going up the stairs?
13   A.    Yes, sir.
14   Q.    All right.  How long was it before
15   Officer Breland went up after him?
16   A.    He was going right behind him.
17   Q.    Was he chasing after him?
18   A.    Well, you can't really say that.  He
19   was chasing -- well, they were walking fast.
20   Q.    Were they running?
21   A.    No.  They weren't running, more like
22   walking fast but not running.  That's how they
23   were going.
24   Q.    At that point who was outside?
25   A.    My wife, and my daughter, Rayneshia,

1  and Susa.

2     Q.    Those were the only ones that were

3  outside?

4     A.    To my knowledge, yes, sir.

5     Q.    All right.  Who was inside?

6     A.    Nobody inside.  Everybody was outside

7  and gone.

8     Q.    Okay.  Rayneshia, Susa were outside?

9     A.    Yes, sir.

10    Q.    And you said somebody had pulled up at

11 some point, right?

12    A.    That's when the officer, the officer

13 and my father was already inside then.

14    Q.    All right.  But when did your other

15 daughter pull up?

16    A.    After they had went inside, that's when

17 she pull up.  I'd say about five minutes after.

18 I'd say five minutes after they had went inside.

19    Q.    Okay.  All right.  Officer Breland told

20 your wife and Rayneshia not to come inside?

21    A.    Yes, sir.

22    Q.    What happened after that?

23    A.    After that, they were all inside.  I

24 don't know what happened after that.  I know I

25 was outside in handcuffs still on the ground.

1      Q.    All right.  Who was the next person to
2  go in the house?
3      A.    Another Hattiesburg police.
4      Q.    Do you know who that was?
5      A.    No, sir.
6      Q.    All right.  You weren't able to see him
7  go inside?
8      A.    I see him but I didn't know who he was.
9  I really couldn't recognize who he was.
10      Q.    You don't see any interaction between
11  him, Officer Breland, or your father as they were
12  inside the house?
13      A.    No, sir.  I couldn't see nothing inside
14  the house.
15      Q.    Did you hear anything?
16      A.    I just heard my daddy hollering, oh,
17  oh, y'all trying to kill me.  That's all I heard.
18      Q.    All right.  Did anyone else go inside
19  the house at any point, other than those two
20  officers, before you were carried to the car?
21      A.    Not to my knowledge.  No, sir.
22      Q.    Did you see anyone come out of the
23  house before you went in the patrol car?
24      A.    No, sir.
25      Q.    All right.  Who came out of the house

1  first?  You said you told me Officer Breland

2  escorted you to the patrol car, right?

3      A.    After he come out from the inside.

4      Q.    All right.  Did you see him come out

5  the house?

6      A.    Not really.  I really wasn't paying no

7  attention to it.

8      Q.    All right.  Did he come out of the

9  house with your father or do you know?

10     A.    I think that the other officer that

11  went in the house had my dad by his arm with the

12  handcuffs on.  I don't know if Officer Breland

13  had his hand on him.  I know when I heard -- when

14  I looked up and I seen him coming down the stairs

15  -- back down the steps, and then I seen them take

16  my dad that way to their car.

17          And Officer Breland came this way,

18  because my truck was parked like this, they went

19  on this side of the truck.  Officer Breland came

20  on this side of the truck, him and the other

21  female officer, and that's when they put me in

22  the police car.

23     Q.    Did you hear anyone say anything during

24  that time period?

25     A.    No, sir.

1    Q.   Did you say anything to the officers
2  during that period of time?
3    A.   No, sir.
4    Q.   All right.  So from the time Officer
5  Breland left you, went inside the house, came
6  back, you didn't say anything to anyone?
7    A.   I was outside on the ground by myself.
8  I was always by myself.
9    Q.   You didn't say anything to anybody?
10   A.   Nobody.  But to my daughter to tell her
11 to come pick me up.
12   Q.   Okay.  And that was the only statement
13 you made?
14   A.   Yes, sir.
15   Q.   Officer Breland comes back with a
16 female officer, right?
17   A.   Yes, sir.
18   Q.   Did you say anything to them at that
19 point?
20   A.   No, sir.
21   Q.   Did you say anything to them as they
22 loaded you in the car?
23   A.   No, sir.
24   Q.   Did they say anything to you as they
25 loaded you in the car?

1    A.    Officer Breland just said, get your ass
2    in the car, like that, and that's when the female
3    officer went around and grabbed me on my
4    shoulder.  As she was pulling, that's when he
5    kicked me in my privates, and that was it.
6    Q.    How many times did he kick you?
7    A.    Two times.  He kick me on my leg and
8    when I went in the car, he kick me in my
9    privates.
10   Q.    Was there anyone else standing around
11   at that point?
12   A.    No, sir.  Not to my knowledge.
13   Q.    Did you say anything at that point?
14   A.    No, sir.
15   Q.    Did you scream?
16   A.    No, sir.
17   Q.    So you got into the car and the door
18   was shut, and you didn't say anything else other
19   than that statement to your daughter?
20   A.    No, sir.  I didn't say nothing else.
21   Q.    While you were on the ground, did you
22   hear anyone say, no, Poppa?
23   A.    I believe that was Rayneshia.
24   Q.    All right.  Why was she saying, no,
25   Poppa?

1    A.    I don't know.  I don't really recall.
2    I heard her say that, though.
3    Q.    All right.  Rayneshia called your
4    father, Poppa?
5    A.    All my children call him Poppa.
6    Q.    Did you hear them say anything else to
7    your dad?
8    A.    The kids?  No, sir.
9    Q.    Did you hear Officer Breland say
10   anything to them?
11   A.    No, sir.  Other than, don't come
12   inside, you can't come inside.
13   Q.    Okay.  When they said, no, Poppa, were
14   you on the ground and Officer Breland was with
15   you?
16   A.    No, sir.  They were already going into
17   the house then.
18   Q.    They were going -- your dad was going
19   in the house, Officer Breland was following him,
20   and that's when they said, no, Poppa?
21   A.    Yes, sir.
22   Q.    Okay.  How many times did they say it?
23   A.    I just heard her say it one time.
24   Q.    Did you see your father as he exited
25   the house?

1    A.    Did he come out the house or he went in
2  the house?

3    Q.    When he came out, when he was
4  handcuffed, did you see that?

5    A.    I seen him, yes, sir.

6    Q.    All right.  Did he walk straight to the
7  patrol car?

8    A.    They were holding him up.  The officers
9  were holding him, took him to the car.

10    Q.    Was he walking on his feet?

11    A.    They was like dragging him.  He wasn't
12  like he was respond -- like he was knocked out.
13  He wasn't walking on his own.

14    Q.    All right.  Were they carrying him?

15    A.    Yes, sir.  Under his arm like this.

16    Q.    Did you see them at any point hit or
17  kick your father?

18    A.    No, sir.  I never see nobody put hands
19  on him.

20    Q.    All right.  Did you see him as they
21  loaded him in the patrol car?

22    A.    I seen him, yes, sir.

23    Q.    How did they load him in the car?

24    A.    Well, I seen him after they -- like I
25  said, after they come down the stairs with him,

when they got between me and the truck, I
couldn't see him no more.  All I seen when he was
coming down the stairs, they had -- the officers
had him like this and he had his head down.

I don't know what car he got into
because, like I said, my vehicle was right here
and that vehicle separate me and him.

Q.    And you didn't see anybody lay hands on
him during that process?

A.    No, sir.

Q.    Did you hear your dad say anything
while he was outside?

A.    No, sir.

Q.    Did you hear anybody say anything to
him while he was outside?

A.    No, sir.

Q.    When they came out the house, you
didn't hear him?

A.    No, sir.  I didn't hear nothing, no,
sir.

Q.    Okay.  Has anyone told you that they
took pictures or a video of this?

A.    Not during the actual activity, no,
sir.

Q.    What pictures or videos are you aware

1  of?

2      A.    No video.  I just seen pictures where

3  my wife and children took pictures of the

4  bathroom, how bloody it was.  Other than that --

5  and pictures of how my dad's face was.  Other

6  than that, that's all I seen.

7      Q.    Who has pictures of the bad condition

8  of the bathroom?

9      A.    I think my daughter should have those

10  pictures.

11      Q.    Which daughter?

12      A.    Rayneshia.

13      Q.    All right.

14      MR. DOSSETT:  And we would ask that

15      those be produced.

16      MR. CARTER:  I thought I produced them

17      but, if not -- I thought I had a copy.

18      MR. DOSSETT:  I'm got pictures, copies

19      of some pictures, but they are black and

20      white and I can't --

21      MR. CARTER:  You can't tell.  Okay.

22      I'll make sure I get some color photos to you

23      by next week.

24  BY MR. DOSSETT:

25      Q.    When was the last time you saw those

1  pictures?

2      A.    When I got out.  When I came back home,

3  about a week.

4      Q.    What happened to you after you were put

5  in the patrol car?

6      A.    They took me down to the police

7  station.  They throw me out on the side of the

8  car, and the officer come out there.  And I know

9  it was a female officer, booking officer, come

10  out there.  And I was hollering and holding my

11  leg.  She looked at my leg and moved my leg and

12  moved my feet -- my feet, and said, do that hurt?

13      I said, yes, ma'am, I think it broke

14  and they won't take me to the hospital.

15      And that's when she told the

16  Hattiesburg police they were going to have to

17  take me to the hospital, they wouldn't accept me

18  like that.  So that's when they called the

19  ambulance, and the ambulance took me to Forrest

20  General.  And Forrest General said it was a real

21  bad sprain.

22      So after that, they took me back to the

23  jail.  And then they wouldn't let me bond out or

24  nothing.  That's when Reverend Fairley got in

25  touch with the lawyer and their lawyers called

1    and they let me out.

2              And when the lawyer -- when I got out,

3    that's when I went to Methodist Hospital and they

4    said I needed surgery.  And that's when they sent

5    me to Southern Bone & Joint.

6              MR. DOSSETT:  I'll take a break right

7         there.

8                    (OFF THE RECORD.)

9    BY MR. DOSSETT:

10        Q.    Wade, you gave me a lot of information

11   in that last answer and I had not heard of

12   before, so let me go back to it.  You went to the

13   jail, Forrest County jail, and they assessed you,

14   right?

15        A.    Yes, sir.

16        Q.    And at that point an ambulance was

17   called?

18        A.    Yes, sir.

19        Q.    Did you see your father while you were

20   there in south Port?

21        A.    They took him straight to the hospital

22   from the house.  For what reason, I don't know.

23        Q.    Okay.  So you never saw your dad at the

24   jail?

25        A.    I seen him when I come back from the

hospital. They brought him in -- after I left the hospital and come back to the jail, that's when they brought him into the jail.

Q. Okay. You didn't see him when you --

A. I was --

Q. Initially when you were at the jail, you didn't see him there?

A. No, sir.

Q. All right. You get in an ambulance and they take you to Forrest General Hospital?

A. Yes, sir.

Q. While you were in the ambulance, did an officer ride with you?

A. No, sir. Not to my knowledge. I don't remember.

Q. What happened once you got to Forrest General?

A. When I got to Forrest General they took me in, you know, the emergency room. And then after I went in the back, that's when Officer Breland was back there. I guess he was patrolling, whatever you call it. And by 30 minutes later another officer came and Officer Breland left, and that officer stay there. And then, when they got through with me at Forrest

General, that's when they took me back to the
county jail.

Q.    Okay.  So you went to the emergency
room and they carried you to the back, I guess,
to run x-rays?

A.    Yes, sir.

Q.    What did the doctor say to you?

A.    He said it was a bad sprain.

Q.    In your ankle?

A.    In my leg, in my knee.

Q.    A bad sprain in your left knee?

A.    Yes, sir.

Q.    Was that all the doctor said to you?

A.    Yes, sir.

Q.    All right.  What happened after that,
as far as where did you go?

A.    After they put a -- cover on my leg and
gave me some crutches.  And that's when I went
back to the county jail and, after that, they
booked me into the county jail.

Q.    All right.  How did you get to the
county jail?

A.    Back in the police -- with the police
that was patrolling when Officer Breland left.

Q.    Not the officer in this case?

1      A.    No, no.  It was another officer that
2   came to relieve him.
3      Q.    Not the one that was at your house?
4      A.    Yeah.  He was nowhere around our house
5   or nothing like that.
6      Q.    All right.  While you were at Forrest
7   General, did anyone tell you you needed surgery?
8      A.    No, sir.
9      Q.    Did they tell you you had a broken
10  bone?
11     A.    No, sir.
12     Q.    Okay.  And then you went back to
13  Forrest County jail and was booked?
14     A.    Yes, sir.
15     Q.    Do you know what charge you were booked
16  on?
17     A.    I know it was resisting arrest and
18  that's all I remember, resisting arrest.  But I
19  think it was like more charges, but I never did
20  know what those charges were.
21     Q.    When you got back to the jail, did you
22  see your father at that point?
23     A.    About an hour later, he had came into
24  the cell.
25     Q.    The same cell you were in?

A.     Well, the new jail they got -- if
you're -- you have to come through that door to
go through to another cell.  But he was in a
separate cell.

Q.     Was this at the new jail then?

A.     Yes, sir.

Q.     So your father came in about an hour
later, but he was in a separate cell?

A.     Yes, sir.

Q.     Could you see him?

A.     Yes, sir.

Q.     Could you talk to him?

A.     Yes, sir.

Q.     All right.  How long were you at
Forrest General?

A.     Around I'd say about between
hour-and-a-half and two.

Q.     Do you know what time you got to the
jail?

A.     No, sir.  I don't remember.

Q.     All right.  Did you talk to your dad?

A.     At the hospital?

Q.     At the jail.

A.     Yes, sir.  When he came in, I talked to
him.

```
1        Q.    What did y'all say?
2        A.    I asked him is he all right and he
3   said, yes.  That's when I'd seen the stitches and
4   stuff on his eye and right there.
5        Q.    You're referring to your right eye?
6        A.    I don't remember which side it was.
7   I'm just using my right hand.  Like I said, I
8   seen the stitches but I don't remember what side
9   it was on.  And I ask him was he all right.  And
10  he said his back was hurting him and his neck was
11  hurting.
12            And by that time the jailer was -- him
13  and my daddy I think had went to the academy
14  together.  That's when they came out there and
15  move my dad over to another cell where they were
16  talking.  And next day, my dad, they had let him
17  out.  But they wouldn't let me bond out until I
18  got out that Friday.
19            And I told my wife to take me back to
20  the --
21        Q.    Well, hold on, before you go further.
22  Why did they let your dad bond out?
23        A.    Why they let him bond out?
24        Q.    Yeah.
25        A.    I don't know why they let him out.  He
```

1   talk to the jailer.  I don't know -- see, I don't

2   know why they wouldn't let me bond out, but they

3   let him bond out.  They said I had to see the

4   judge which was going to be on that Friday.

5   And -- but when my dad got out, he went on home.

6           And that's when my wife called Kenneth

7   Fairley and Kenneth Fairley called the lawyer and

8   they let me out the next day.

9       Q.   All right.  What day were you arrested

10  on or what night?  I should say.

11      A.   I believe that was a Wednesday if I'm

12  not mistaken.

13      Q.   On Wednesday night?

14      A.   Yes, sir.

15      Q.   And so you get into the jail that

16  night, right?

17      A.   Yes, sir.

18      Q.   All right.  The following day that's

19  Thursday, you think?

20      A.   Yes, sir.

21      Q.   And your dad gets out that day?

22      A.   Yes, sir.

23      Q.   But they told you you had to wait to

24  see the judge?

25      A.   Yes, sir.

1    Q.    All right.  And who called Kenneth
2 Fairley?
3    A.    My uncle which is a pastor, Reverend
4 Perry Wade, called the Reverend Kenneth Fairley.
5 And Reverend Kenneth Fairley called the attorney
6 and whatever the attorney told the jailer.
7    Q.    What attorney?
8    THE WITNESS:  I think it was you?
9 Reverend Fairley called you?
10    MR. CARTER:  I don't know.  I don't
11    recall.
12    THE WITNESS:  I don't know which
13    attorney.  But he told me he had called his
14    lawyer and I'll be out that day.  So whomever
15    the attorney my uncle called, they -- him and
16    Kenneth Fairley, I got out anyway.  That's
17    how I know I got out of jail.
18 BY MR. DOSSETT:
19    Q.    Did you ever see a judge?
20    A.    No sir.  I didn't get a chance to see
21 the judge because I was supposed to see the judge
22 on Friday.  I got out on Thursday, the next day.
23    Q.    The same day your dad got out?
24    A.    No.  I got out a day after my dad.  So
25 it might have been on Friday morning I got out.

1    I know my daddy got out. It might have

2 been a Tuesday because I know -- he got out that

3 day and the next day I got out.

4    Q.   You went one additional day than your

5 dad?

6    A.   Yes, sir. I don't know it was that

7 Friday because I was suppose to be seeing the

8 judge that Friday. But I got out before that

9 Friday. I didn't see the judge so that had to be

10 Tuesday -- that Wednesday, I believe.

11    Q.   Did you ever see a lawyer or talk to a

12 lawyer while you were in jail?

13    A.   No, sir.

14    Q.   And you don't who it was that Kenneth

15 Fairley called?

16    A.   No, sir.

17    Q.   Did you know Kenneth Fairley?

18    A.   Yes, sir. I know him.

19    Q.   How did you know him?

20    A.   By him being pastor and he was with the

21 kids that played -- by the City baseball,

22 basketball and football, and my son played in

23 that league with them.

24    Q.   Okay. Did you go to Mount Carmel?

25    A.   No, sir. I go to Sweet Perry.

1     Q.    Where?

2     A.    Sweet Perry Mission Baptist Church.

3     Q.    After you got out and went home, what

4    happened?

5     A.    I couldn't stand up.  I couldn't walk

6    so I told my wife that --

7     Q.    What was the reason -- I don't want to

8    put words in your mouth, but why couldn't you

9    walk?

10    A.    Because I know my leg was broke.

11    Q.    Your left leg?

12    A.    Yes, sir.  And I couldn't put no

13   pressure on it.  I know it was more than a

14   sprain.  That's when I said to take me to Wesley

15   because Forrest, I don't think they did a pretty

16   good job.

17    Q.    While you were at Forrest General,

18   though, they did an x-ray?

19    A.    Yes, sir.  I believe they did an x-ray.

20    Q.    What did they x-ray, the left foot?

21    A.    Yes, sir.

22    Q.    Did they take any other x-rays?

23    A.    No, sir.

24    Q.    They didn't take any kind of MRI of

25   your head or anything like that?

1    A.    No, sir.

2    Q.    Did you get any stitches at Forrest

3 General?

4    A.    No, sir.  I didn't get nothing at

5 Forrest General.

6    Q.    Did they put any kind of wrap on your

7 leg?

8    A.    Not -- no wrap, just one of them -- one

9 of them things, you know, like you fold up with a

10 little zip.

11    Q.    Like a brace?

12    A.    Like a brace, yes, sir.

13    Q.    All right.  How long were you out

14 before you went to Wesley Medical Center?

15    A.    I went that same evening I got out.  I

16 think that was on a Thursday.  I went that

17 Thursday and then they took me back there and did

18 x-rays and said I had to have immediate surgery.

19         And they sent me from there straight to

20 Urgent Care -- not Urgent Care, the Southern Bone

21 & Joint.  So when I got to Southern Bone & Joint,

22 the doctor came in, Dr. Kosko, I think was his

23 name.  And he was saying I had -- they were going

24 to have to reconstruct my knee because it is

25 shattered.

1        And then he called another doctor in,

2   which was Dr. Nipper, and he looked at it.  And

3   after he looked at it, I went -- I mean,

4   downstairs for an MRI or whatever they call it.

5   And then that's when he did the surgery the next

6   day.

7        Q.   Was that within a week of the arrest?

8        A.   That was the same week.

9        Q.   Same week?

10       A.   Yes, sir.

11       Q.   And where was your surgery performed

12   at?

13       A.   At Southern Bone & Joint.

14       Q.   So you go to Wesley and they sent you

15   to Southern Bone?

16       A.   Yes, sir.

17       Q.   How long between the time you went to

18   Wesley and Southern Bone?

19       A.   When I left Wesley, I had went home.

20   Because when he said go to Southern Bone & Joint,

21   I didn't think he was talking about go right now.

22   So when I called Southern Bone & Joint to see

23   what was my appointment, and they said you

24   suppose to be in here at such and such a time.

25   Come now.

          So I think I was supposed to be there
like 10:30, 11:30, but I got there about 2:00.
And when I got there, that's when they took me to
the doctor, and he was the one that looked at it.

          And after, they did x-ray and he
brought Dr. Nipper.  And Dr. Nipper told me that
they were going to have to reconstruct my knee,
and he would be the doctor doing the surgery.
And that's when I went on from there.

          Q.   Did you go home after that?

          A.   Yes, sir -- after surgery?

          Q.   I mean, you go to Southern Bone &
Joint, did they do surgery that same day?

          A.   Yes.  They did surgery the same day.

          Q.   So you didn't go home, you went from
Wesley to Southern Bone and then they did surgery
that day?

          A.   Yes, sir.

          Q.   All right.  And did they send you home
that day?

          A.   Yes, sir.  After surgery?

          Q.   Uh-huh.

          A.   Yes, sir.

          Q.   All right.  We discussed Forrest
General on that day that you were arrested.  And

1 then Wesley the day that you were released; is
2 that right?
3     A.    Yes, sir.
4     Q.    And then Southern Bone & Joint.  Did
5 you go to any other doctors during that time
6 period?
7     A.    What you mean, before I had surgery or
8 after I had surgery?
9     Q.    Before you had surgery.
10     A.    No, sir.  After Wesley, that was the
11 last one.  I went to them and then I went to
12 Southern Bone & Joint.
13     Q.    All right.  So from the time you were
14 arrested and your encounter with Officer Breland,
15 to the time you had surgery, did anything happen
16 to your knee?
17     A.    No, sir.
18     Q.    Did you have any type of injury to it
19 as far as or additional type of injury to your
20 knee?
21     A.    No, sir.
22     Q.    After your surgery, tell me what
23 happened medically.
24     A.    After my surgery, I went home.  After I
25 went home, it was about a week, week-and-a-half,

1   and then they said I have to start going to

2   therapy.  I start going to therapy twice a week,

3   either Monday and Wednesday or Wednesday and

4   Friday so I rotate.  One week, Monday, Wednesday,

5   and then the next week Wednesday and Friday.

6        Q.   How long did that last?

7        A.   About three months.  After about two

8   visits, that's when they took the staples out and

9   that's when I was -- still was going to therapy

10  for about two months.

11       Q.   And you do anything after physical

12  therapy?

13       A.   They let me go home.

14       Q.   And you went to see your doctor at

15  Southern Bone & Joint?

16       A.   Yes, sir.

17       Q.   Where did you do physical therapy at?

18       A.   Southern Bone & Joint.

19       Q.   All right.  Did you go anywhere else

20  other than that?

21       A.   No, sir.  I went there for therapy and

22  there for the surgery.

23       Q.   All right.  Was there any other doctor

24  you saw after that for your leg?

25       A.   No.  Dr. Nipper, that was the same

1    doctor.

2         Q.    Okay.  No other doctor?

3         A.    No, sir.

4         Q.    Up to today, have you seen any other

5    doctor for your leg?

6         A.    No, sir.

7         Q.    All right.  Have you seen, other than

8    the doctors we have discussed, have you seen any

9    other doctors for anything related to this event?

10        A.    No, sir.

11        Q.    All right.  Other than the surgery on

12   your leg, did you have any kind of treatment for

13   anything else?

14        A.    Yeah.  After I'd say about -- I'd say

15   about a good two months after, feeling come back

16   into my leg, and I started trying to stand up on

17   it.  As I started standing up on it, I discovered

18   that around my ankle part was hurt bad and I

19   couldn't put no pressure on my feet.

20              So after that, I went back to Southern

21   Bone & Joint and they ran an MRI on my feet and

22   discovered my feet was also broke and that's when

23   I got the boot to put on my feet.

24        Q.    Where was your foot broke?

25        A.    Around up around my ankle part or right

1   there.

2         Q.   On your left leg?

3         A.   Yes, sir.  The same leg.

4         Q.   All right.  When you say that you were

5   kicked, where were you kicked?  Where was the

6   contact made?

7         A.   Like right here.

8         Q.   You're pointing to your left knee?

9         A.   Yes, sir.  Right there.

10        Q.   All right.  You weren't kicked in your

11  ankle?

12        A.   No, sir.  There was no kick on my

13  ankle.

14        Q.   Okay.  After you -- they say you had a

15  problem with your ankle, they put a boot on you?

16        A.   Yes, sir.

17        Q.   At Southern Bone & Joint?

18        A.   Yes, sir.

19        Q.   Did you have any kind of surgery for

20  that?

21        A.   Not for that.  He said it was like a

22  hairline -- broken and put that boot on and keep

23  my leg elevated up.

24        Q.   Did you do any physical therapy for

25  your ankle?

1    A.    Just for my leg.

2    Q.    All right.  How long after your knee

3    surgery did you go see someone for your ankle?

4    A.    About a month or two.

5    Q.    All right.  Anything else, other than

6    your ankle, that you received treatment for?

7    A.    No, sir.

8    Q.    Who was your doctor for your ankle?

9    A.    The same, Dr. Nipper.

10   Q.    All right.  Can I see your scar that

11   you got from your surgery?

12   A.    (Witness complies.)

13        And there's a plate from there to

14   there.

15   Q.    What I'm looking at is a scar that

16   starts on the left of the left leg and it extends

17   below the kneecap to the shinbone about six to

18   seven inches; is that correct?

19   A.    Yes, sir.

20   Q.    And that scar that you have there, you

21   didn't have a scar, right, before?

22   A.    No, sir.

23   Q.    Do you have any other scars on either

24   of your legs?

25   A.    No, sir.  Never had a broken bone in a

1    day in my life until this.

2        Q.    And you said you have a plate in your

3    leg?

4        A.    Yes, sir.

5        Q.    What was the purpose of the plate?

6        A.    The bone that was shattered is on the

7    top and screws in it, three -- I think it's six

8    screws.

9        Q.    So the bone that they fixed was a

10   shinbone?

11       A.    I think so.

12       Q.    It wasn't anything inside the kneecap,

13   right?

14       A.    They said something about the kneecap.

15   I can't recall what he said about it, but it's in

16   the doctor's report.  That's why he didn't cut it

17   on top of the knee.  He went around and went up

18   under the kneecap and connected something with

19   the screws to the shinbone.

20       Q.    Okay.  Did you have medical insurance?

21       A.    Yes, sir.

22       Q.    Who was your medical insurance through?

23       A.    At that time it was United Health Care.

24       Q.    Was that through your employer?

25       A.    Yes, sir.

1        MR. DOSSETT: We would ask that if

2     there's any kind of medical lien, that you

3     produce any kind of medical lien to us.

4        MR. CARTER: Okay.

5 BY MR. DOSSETT:

6     Q. Have you ever seen a medical lien? Do

7 you know what I mean? Have you seen any

8 statement saying they are asserting a lien?

9     A. No, sir. All I know is that I pay

10 Southern Bone & Joint every month and that's all

11 the statement I get.

12     Q. Do you know how much the total of your

13 medical expenses are?

14     A. Not offhand. But right now, as we have

15 been paying them, there's still 14,300- and

16 something dollars that I just pay $45 a month,

17 though.

18     Q. Did your medical insurance pay some of

19 the bills?

20     A. Yes, sir. They paid some of it, but

21 like on the MRI, I had to pay cash money for

22 that. And I had to borrow that money from my

23 boss man to pay that.

24     Q. Did you miss any work?

25     A. I was off from that day it happened to

November.

Q.   You didn't work --

A.   From April.

Q.   -- from April to November?

A.   Yes, sir.

Q.   How much did you make a year?

A.   Well, at that time I was making like $13 an hour.

Q.   How much was your monthly take home or net, gross or net?  How much was your pay check?

A.   It was about like -- see, I really can't base it on that, what you just ask me. Because we work like contract work and, if I work eight hours on what we normally work, but after 5:00, it's contract work they call it.  But it still -- they put the check together, as regular hour and contract, they all put it all together. So some pay period I might make $1,500, some pay periods I might make $1,100, some pay periods I might make $1,000.  It just depends on what we do on contract.

Q.   How long is the pay period?

A.   We get paid on the 1st and the 16th.

Q.   Twice a month?

A.   Yes, sir.

1    Q.    So your normal take home pay would be
2    anywhere from 2000 to 2,500?
3    A.    Yes, sir.
4          MR. CARTER:  Like what you're saying,
5          are you talking about a month or pay period
6          or every two weeks?
7    BY MR. DOSSETT:
8    Q.    A month.
9    A.    One month?
10   Q.    Yeah.
11   A.    Yeah.  That's about right.
12   Q.    As far as vacation time or work time,
13   were you paid during that period of time from
14   April to November?
15   A.    No, sir.  I would get paid -- say like
16   you get ten days a year for vacation and you get
17   ten days a year for sick leave.  After I had used
18   my ten days vacation and my ten days sick leave,
19   it was -- I no longer could get no more money
20   from my job because it didn't happen on the job.
21         That's when I had to take and go into
22   my 401K to balance out my bills during that time.
23   Then I also had to sell one of my vehicles to
24   keep my bills paid.  And then that's how I made
25   it, out of the money from my 401K and selling one

1    of my vehicles.

2       Q.   Were you on any kind of medications

3    during this period of time?

4       A.   They gave me some pain medicine.

5       Q.   Do you remember what it was?

6       A.   It was some Lortabs 10 and Ibuprofen.

7       Q.   Any other medication you took?

8       A.   No, sir.

9       Q.   All right.  How long were you on pain

10   medication?

11       A.   When I ran out -- they gave me 60, and

12   I take it one or sometimes two a day, depending

13   on the pain.

14       Q.   You still take them?

15       A.   Oh no.  I was through taking them.

16   After I took them 60 but I went back and --

17       Q.   I'm just trying to get a time period,

18   you're giving me a number.  What month did you

19   quit taking pain pills?

20       A.   I get them -- about May, I didn't take

21   no more medication.

22       Q.   All right.  And you're not taking any

23   medications today?

24       A.   Nothing but Ibuprofen and Tylenol that

25   I take, like it rain or get cloudy and it hurt so

1   bad, that's what I take and just rubbing it with

2   alcohol and heat pad.

3       Q.   But on a normal day you don't take

4   anything else?

5       A.   No, sir.

6       Q.   Who is Dr. Frederick Martin?

7       A.   Excuse me?

8       Q.   Dr. Frederick Martin, do you know who

9   that is?

10      A.   I don't know who that is.

11      Q.   Officer Mark Benny, Zac Roth, Danielle

12  Lewis, do you know what they know or have you

13  ever talked to them?

14      A.   No, sir.

15      Q.   What about your father's medical

16  condition, have you ever seen any of his medical

17  records?

18      A.   Have I seen them?  Yes, sir.  I look at

19  them.

20      Q.   What treatment, if any, did he have?

21      A.   He just, like I said, he just took

22  blood pressure pills --

23      Q.   Related to the incident.  What

24  treatments did he have?

25      A.   Oh, he just follow up back and forth

1  with the doctors.  What kind of medication he was
2  on or something?

3       Q.   Do you know what kind of injuries he
4  had, if any?

5       A.   All, like I said, all I seen was the
6  stitches under his eye, and he said something
7  about his vertebra in his back and his neck.  And
8  that's all I know was what the doctor said.

9       Q.   He was treated at Forrest General?

10      A.   Yes, sir.

11      Q.   All right.  They put stitches in his
12 eye?

13      A.   Yes, sir.

14      Q.   And did he go anywhere else after that?

15      A.   He follow up with his doctor,
16 Dr. Lovitt, every month in Petal but, as far as
17 going back to Forrest General, he didn't go back
18 there.

19      Q.   He didn't go anywhere other than,
20 Dr. Lovitt?

21      A.   Yes, sir.

22      Q.   What was wrong, other than his eye
23 where you said he had stitches, anything else?

24      A.   Just his back was hurting and his neck.

25      Q.   But you don't know what specifically he

1  had?

2      A.   No, sir.

3      Q.   Do you know if your dad was on

4  Medicare?

5      A.   Yes, sir.  He was on Medicare and

6  Medicaid.  I believe he was on both of them.

7          MR. DOSSETT:  Ottowa, do you know if

8      you requested any type of Medicare lien?

9          MR. CARTER:  I don't think I have.

10         MR. DOSSETT:  All right.  And, if you

11     did, we'll request a copy of any type of

12     Medicare lien.

13 BY MR. DOSSETT:

14     Q.   Did any of the officers take any of

15 your property at any point?

16     A.   No, sir.  They took it at the jail.

17     Q.   All right.  Was there any type of

18 search that you felt was inappropriate?

19     A.   No, sir.

20     Q.   Okay.  As far as your father is

21 concerned, are you aware of any type of search

22 that was inappropriate?

23     A.   I didn't -- I can't recall.

24     Q.   You don't have any facts or knowledge

25 of an inappropriate search on him?

1    A.    No, sir.

2    Q.    Or seizures as far as property is

3 concerned?

4    A.    All I know, I never received his badge

5 back.

6    Q.    Do you know if he got it?

7    A.    He didn't have it.  He asked me did

8 I -- they didn't give it back to him with his

9 property.

10    Q.    You don't know where it was located or

11 who took it?

12    A.    No, sir.

13    Q.    He never told you who took it?

14    A.    No, sir.

15    Q.    In other words, you don't know if it

16 was taken at the jail or who took it?

17    A.    No, sir.  I don't know if the police

18 took it or if they took it at the jail or --

19    Q.    Okay.  Who is Danielle Lewis?  Do you

20 know who that is?

21    A.    Danielle Lewis?

22    Q.    Uh-huh.

23    A.    No, sir.

24              (EXHIBIT 2 MARKED.)

25 BY MR. DOSSETT:

1      Q.   I'm going to show you a statement we'll
2   mark as Exhibit 2.   It says, on 4/16/2013 at
3   approximately 2230 hours while at the hospital
4   with 10-95, George Wade, Sr., Wade told hospital
5   staff he had pain in his back.   When they asked
6   about the back pain, Wade stated he had hurt it
7   around 1530 hours while doing work at home and
8   had nothing to do with altercation at 1500 Cherry
9   Street.   End statement.
10           Did your father ever tell you he had
11  hurt his back at home?
12      A.   No, sir.   He wouldn't be doing no work
13  at home.
14      Q.   Why do you say that?
15      A.   I know he wouldn't be doing no work,
16  because he stay in an apartment, and he didn't
17  have nothing to do at home, no kind of work.
18      Q.   He never told you that he hurt his back
19  at home?
20      A.   No, sir.
21      Q.   And you don't know who Danielle Lewis
22  is?
23      A.   No, sir.
24           MR. DOSSETT:   Off the record.
25               (OFF THE RECORD.)

BY MR. DOSSETT:

Q.    While you were at the hospital at
Forrest General, did they treat you for anything
other than your leg?

A.    No, sir.  Not to my knowledge.  No,
sir.

Q.    They didn't scan your head, did they?

A.    No, sir.

Q.    They didn't give you any stitches on
your head?

A.    No, sir.

Q.    When I say scan, they didn't do an
x-ray or any kind of radiological stuff?

A.    No, sir.

Q.    Did they look at your private parts?

A.    No, sir.

Q.    Did you complain about any injury to
your private parts?

A.    No, sir.

Q.    You didn't say anything to your doctor
about being kicked?

A.    In my private parts, no, sir.

Q.    Did you say anything to your doctor
about your head?

A.    No, sir.

1    Q.   All right.  When you went to Wesley

2  Medical Center, did you say anything to them

3  about your private parts?

4    A.   No, sir.

5    Q.   When I say, private parts, obviously

6  I'm using a general reference to between your

7  legs.

8    A.   Yes, sir.

9    Q.   All right.  Did you say anything to

10  Wesley about your head?

11    A.   No, sir.

12    Q.   Did you file any type of complaint with

13  the Hattiesburg Police Department?

14    A.   Not to my knowledge.

15    Q.   Did you ever call Hattiesburg Police

16  Department and say Officer Breland used excessive

17  force on me?

18    A.   No, sir.

19    Q.   Did you ever write them a letter and

20  say Officer Breland used excessive force on me?

21    A.   No, sir.

22    Q.   Did you contact the Hattiesburg Police

23  Department or their Chief or anyone, other than

24  your attorney, and tell them they did something

25  wrong to you?

1    A.    No, sir.

2    Q.    Are you aware of your father contacting

3  Hattiesburg Police Department and telling anyone

4  that they did anything wrong to him?

5    A.    No, sir.  Not to my knowledge.

6    Q.    Are you aware of anyone contacting HPD

7  on your father's behalf and saying they did

8  something inappropriate to your father?

9    A.    Not to my knowledge.

10    Q.    And I think I asked this, but you're

11  not aware of your father contacting anyone at

12  HPD?

13    A.    No, sir.  Not to my knowledge.

14    Q.    Other than filing a lawsuit, have you

15  done anything, other than that, to make it known

16  that you claim that what you felt happened to you

17  was not appropriate?

18    A.    No, sir.

19    Q.    What about your father, other than

20  filing a lawsuit, did he do anything else?

21    A.    Not to my knowledge.

22    Q.    After this arrest, did you ever have

23  any contact with Officer Breland or Officer

24  Holden?

25    A.    After the arrest?  No, sir.

Q.   Do you know anyone who did?

A.   No, sir.  Not no name, none of that.

Q.   All right.  Have you heard anything about Officer Breland or Officer Holden?

A.   Well, on the street was some guys hanging out there.  I seen Officer Breland get out his vehicle and slap a guy and tell him to go head on and that's all I seen him.  But after that, I haven't seen him in Hattiesburg no more.

Q.   When was that?

A.   That was about -- that was about, I'd say about four or five months after I got myself back together to walk on the crutches really and I was going to the store.  And I'd see the police officer pull up, and then I had seen Officer Breland slap the guy.

And my son-in-law at the time stay over there and I asked him what was going on.  And he said some gang boys out there.  And I ask him why.  He didn't know.  So I never -- I didn't know either.  So I just didn't say nothing about that.

Q.   You didn't contact Hattiesburg Police Department about that incident?

A.   No, sir.

Q.    After your medical treatments, tell me
what happened with the court case?

A.    What happened to the court case?

Q.    Uh-huh.  As far as the criminal
charges.

A.    I had called and see what the charges I
was charged with and all that.  And they said
they had thrown it out, and they didn't explain
to me why or tell me why.  You know, when they
say you have to go to court, and I was calling to
see when was my court date for whatever they had
charged me with, and they said it was thrown out
of court, and I didn't have no court date and
that was it.

Q.    What about your father's charges?

A.    I think his was thrown out, too.

Q.    Okay.  Did you have an attorney at that
time?

A.    That was the attorney right here.

Q.    Mr. Carter?

A.    Yes, sir.

Q.    All right.  When did you retain
Mr. Carter?

A.    Well, back in -- after I had surgery,
about a couple weeks after I had surgery, if I'm

1   not mistaken.

2      Q.    And you got Mr. Carter for your

3   criminal charges?

4      A.    Well, this -- I have my uncle.  My

5   uncle, like I said, is Preacher Perry Wade.  He

6   had told me that he was going to get an attorney

7   for this.  And when he notified me that's who the

8   attorney was, I was going to call him.  I mean,

9   Mr. Carter.

10     Q.    And Mr. Carter represented you on the

11  charges?

12     A.    He was on the case and that's when they

13  said they throw it out.

14     Q.    All right.  Did you contact the court

15  or did the court contact you?

16     A.    I contacted the court to see what, you

17  know, when I had to go court and what I had to go

18  to court for.  And they said the case on me had

19  been dismissed.  That's what they call it.

20     Q.    All right.  Did you ever hear that you

21  had a court date?

22     A.    No, sir, I didn't.

23     Q.    What about a conviction, did you ever

24  hear that you were convicted at the municipal

25  court?

1     A.   No, sir.

2     Q.   No one ever told you you had been

3  convicted?

4     A.   No, sir.

5     Q.   What about your father, did you ever

6  hear of him being convicted?

7     A.   No, sir.

8     Q.   All right.  What about filing an

9  appeal, did you ever hear anything about an

10  appeal?

11     A.   No, sir.  None.

12     Q.   Nobody ever told you that your case was

13  going to be appealed?

14     A.   No, sir.

15     Q.   You don't know anything about your

16  father's case being appealed?

17     A.   Not to my knowledge.

18     Q.   And you don't know of anything related

19  to you being convicted of a charge?

20     A.   No, sir.

21     Q.   Or any kind of appeal?

22     A.   No, sir.

23     Q.   I understand your father died in 2016?

24     A.   Yes, sir.

25     Q.   Last year?

1    A.    Yes, sir.

2    Q.    What did he die from?

3    A.    They said natural causes.

4    Q.    Okay.  Was he at home?

5    A.    He was at the hospital.

6    Q.    Okay.  Did he have any kind of

7    condition?

8    A.    Well, they had -- after the -- after

9    the incident, he didn't participate in no more

10   activities like he just stayed in the bed.  And

11   then after he had laid in the bed and, you know,

12   we had got home health nurses for him to come see

13   about him at home.

14          And then, after that, he just gave up

15   and he never tried to walk or nothing.  We tried

16   to get him up and walking, and he never did want

17   to walk or nothing.  And after, the doctor said

18   he had dementia and he really couldn't remember

19   nothing else, nothing no more.

20   Q.    When was he diagnosed with dementia?

21   A.    I really can't recall.  I really can't

22   recall.  I don't know if it was before or after

23   the incident.  But I know --

24   Q.    Was he having mental problems before

25   this incident?

1    A.    No.  He wasn't having no problems at

2    all.  Because I used to go get him every day and

3    ride him around, and he would tell me where he

4    wanted to go and I'd take him.  You know what I'm

5    saying.

6         That's how he ended up at my house on

7    that day.  And that was the day I got paid and I

8    told him I was going to take him out to eat.

9    Because him and my son, like to eat at those

10   restaurants.  And, not to my knowledge, he didn't

11   have no more problems.

12        And, like I said, when he had got down,

13   where he had gave up, and he had got a sore on

14   one of his side where he laid there all the time,

15   a bed sore.  And I think that got infected and

16   that's when they said the blood wasn't going to

17   his leg no more.

18        My sister had took him to the doctor,

19   and they were going to evaluate where they had to

20   take his leg off.  And that day he got to the

21   hospital, they said he was too weak to have his

22   leg taken off.  And that's when they put him in

23   ICU and that was Tuesday or Wednesday up in

24   middle of the week.  And the doctor said his body

25   just too weak, he couldn't take it.  And just

that Monday evening he passed.

Q.   Other than what we've discussed about
the incident, the questions I asked you about how
it happened and your treatment afterwards, is
there anything you would like to add other than
what we've talked about?

A.   No, sir.

Q.   Did you have any other medical
treatment or care other than what we talked
about?

A.   No, sir.

Q.   As far as your father is concerned, did
he have any other treatments other than what we
discussed?

A.   Not to my knowledge, no sir.

Q.   Did you and your father ever discuss
what happened that night?

A.   Well, like I said, when -- no.  When I
asked him a question and he just said, son, I
don't remember nothing happen that night.  I
really don't want to talk about it.  And I just
left it and never asked him nothing else about
it.

        MR. DOSSETT:  That's all the questions
    I have.

1    MR. CARTER:  I think I have one or two
2    questions to clarify some things.  Just a
3    second.

4                    **EXAMINATION**
5    BY MR. CARTER:
6        Q.    When Mr. Dossett was questioning you
7    earlier, there was an issue I don't think I was
8    straight about.  I believe you testified that
9    when you got out of the jail and I think you
10   testified it probably was a Thursday, do you
11   recall that?
12       A.    That day that I went to the hospital?
13       Q.    You remember the day you got out?
14       A.    I believe it was Thursday.
15       Q.    Okay.  And I believe your testimony was
16   that you went to Wesley?
17       A.    Yes, sir.
18       Q.    You went to Wesley and -- is that
19   correct?
20       A.    Yes, sir.
21       Q.    And then at that point when you left
22   Wesley, where did you go?  Did you go directly to
23   Southern Bone & Joint or did you go home?
24       A.    I went home first.  Because when they
25   said I had to have surgery, I was thinking like

1  you have to go to make an appointment.

2     Q.   Right.

3     A.   But I didn't know they had already set

4  the procedure up for that.  And when I called to

5  get the appointment, they said I supposed to be

6  there today at 10:00 or 11:00.

7     Q.   Right.  So when you left Wesley, you

8  went home?

9     A.   Yes, sir.

10    Q.   Okay.  And when you got home you called

11 Southern Bone & Joint?

12    A.   To try and make an appointment for

13 the -- to see when the surgery was going to be.

14    Q.   Right.  And at that point when you

15 contacted Southern Bone & Joint from your home,

16 the person or people told you that you needed to

17 come on in at that time, that day?

18    A.   Yes, sir.  I suppose to have that

19 surgery that day.

20    Q.   All right.

21         MR. CARTER:  I think that's all I had

22    to ask.  I wasn't clear on that.  So I tender

23    the witness.

24         MR. DOSSETT:  No other questions.

25         (Deposition concluded at 1:07 p.m.)

CERTIFICATE OF COURT REPORTER

I, Angeli English, Court Reporter and Notary Public in and for the County of Harrison, State of Mississippi, hereby certify that the foregoing pages, and including this page, contain a true and correct transcript of the testimony of the witness, as taken by me at the time and place heretofore stated, and later reduced to typewritten form by computer-aided transcription under my supervision and to the best of my skill and ability.

I further certify that the witness was placed under oath to truthfully answer the questions in this matter.

I further certify that I am not in the employ of or related to any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceedings.

Witness my signature and seal this the _____ day of _____, 2017.


_____
ANGELI ENGLISH
My Commission Expires May 28, 2019

ERRATA SHEET

I, _____ , do solemnly swear
that I have read the foregoing pages and that the
same is a true and correct transcript of the
testimony given by me at the time and place
hereinbefore set forth, with the following
corrections:

PAGE:  LINE:   SHOULD READ:      REASON FOR CHANGE:

_____  _____   _____      _____

_____  _____   _____      _____

_____  _____   _____      _____

_____  _____   _____      _____

                _____
                        (WITNESS SIGNATURE)


NOTARIZATION

I, _____, notary public for
the State of _____, _____
County, do hereby certify that _____
personally appeared before me this _____ day of
_____, 2017, at _____,
_____.

My Commission Expires

_____      _____
                        (NOTARY PUBLIC)